UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

DONNELL PERKINS,

                              Plaintiff,

                v.

THE CITY OF NEW YORK, ANTHONY
PITRE, BRIAN McNULTY, and ROBERT
SALEM, in their individual and official
capacities,

                              Defendants.

**COMPLAINT**

No. 24-cv-6366

Jury Trial Demanded

Plaintiff Donnell Perkins, by his attorneys, the Law Offices of Joel B. Rudin, P.C.,

respectfully alleges, upon information and belief, as follows:

## NATURE OF THE ACTION

1.      This is a civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, New York State

law, and the New York City Administrative Code, seeking monetary damages for the Plaintiff,

Donnell Perkins, due to his unlawful criminal prosecution and conviction for murder in

Brooklyn, New York; his pretrial detention and post-conviction imprisonment totaling 21 and

one-half years; and his additional consequential damages.

2.      In 1999, Donnell Perkins was 17 years old and living in Brooklyn. He had no

criminal record.

3.      However, as a result of the misconduct, detailed below, by members of the New

York City Police Department ("NYPD") and the Kings County District Attorney's Office

("KCDAO" or "DA's Office"), Donnell Perkins was wrongfully prosecuted for and convicted of

a murder that he had nothing to do with.

4.      He lost more than two decades—the prime of his life—to jail and prison.

5.    Believing that Perkins knew the whereabouts of his cousin, who was the suspected shooter in a 1999 Christmas Eve murder, detectives repeatedly pulled Perkins over in his car and threatened that if he did not tell them where his cousin was, they would falsely implicate him in the same murder. When Perkins didn't help them, that's exactly what they did.

6.    Even though Perkins did not remotely fit the sole eyewitness's description of the shooter's accomplice, and the assigned detective knew Perkins almost certainly was innocent, the detective used highly suggestive procedures to manufacture a false lineup identification by the eyewitness. He then followed this up by preparing a series of false or misleading police reports, concealing information favorable to the defense, and committing other misconduct.

7.    Such investigative tactics occurred with impunity in the 1990s and 2000s at the NYPD and the KCDAO, leading to numerous wrongful convictions.

8.    The toleration of such misconduct by policymaking officials encouraged its repetition and led directly to the miscarriage of justice that occurred in this case.

9.    In 2023, a Brooklyn state court vacated Perkins's conviction after he proved at a hearing that the eyewitness had lied about his eyesight and needed eyeglasses for distance vision, which the witness wasn't wearing at the time of the shooting. The prosecution later moved to dismiss the indictment. Perkins had served a total of 21 and one half years in jail and prison for a crime he did not commit.

10.    Perkins brings this civil action against the individual police detectives who collaborated in framing him and against the City of New York for the unlawful policies and practices of the NYPD and KCDAO that contributed to causing his wrongful prosecution and conviction and resultant injuries.

**JURISDICTION, VENUE, AND CONDITIONS PRECEDENT**

11.     This action arises under 42 U.S.C. §§ 1983 and 1988 and under the common law of the State of New York.

12.     The acts and omissions giving rise to this complaint occurred in Kings County.

13.     Plaintiff's damages exceed $25,000.

14.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 and under the principles of pendent jurisdiction.

15.     Venue is proper under 28 U.S.C. § 1391.

16.     This action has been commenced within the applicable period for each claim.

17.     On or about September 7, 2023, Plaintiff served the City of New York timely notice of the present claims, in accordance with N.Y. Gen. Mun. Law § 50-e.

18.     On July 24, 2024, the City of New York conducted a hearing in accordance with N.Y. Gen. Mun. Law § 50-h.

19.     Plaintiff has duly complied with all the conditions precedent to the commencement of this action.

**THE PARTIES**

20.     Plaintiff DONNELL PERKINS is a citizen and resident of the State of New York and of the United States. He resides within the Eastern District of New York.

21.     Defendant ANTHONY J. PITRE, Shield No. 3417, was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

22.     Defendant BRIAN McNULTY, Shield No. 2043, was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

23.     Defendant ROBERT SALEM, Shield No. 17, was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

24.     Defendant CITY OF NEW YORK is a municipal corporation of the State of New York and is a resident of the Eastern District of New York.

25.     Below, Defendants Pitre, McNulty, and Salem are collectively referred to as the "Individual Defendants."

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### The fatal shooting of Reuben Scrubb

26.     On December 25, 1999, just after 4:00 a.m., someone shot and killed Reuben Scrubb at a Sunoco gas station in Brooklyn, New York.

27.     Scrubb's friend Ernest Brown also was present when the shooting occurred.

28.     Brown immediately called 911.

29.     On the 911 call, Brown reported that the shooter had fired from a gray Infiniti Q45.

30.     Interviewed shortly thereafter by law enforcement, Brown gave the following account of the shooting and the events preceding it.

31.     Moments before the shooting, Brown and Scrubb had left a bar called Po'k Knockers.

32.    As Brown and Scrubb stood on the sidewalk, a man came out of Po'k Knockers, bumped into Scrubb, and argued with Scrubb.

33.    This man then crossed the street and got into a car.

34.    Brown and Scrubb walked in the same direction as the man, toward a gas station located on the other side of the street.

35.    When Brown and Scrubb were at the gas station, an Infiniti Q45 pulled into the station.

36.    Sitting in the passenger seat of the Q45 was the man whom Brown recognized as the person who had exited Po'k Knockers and bumped Scrubb (the "bumper-passenger").

37.    The bumper-passenger and the driver (the "driver-shooter") began arguing with Scrubb.

38.    The driver-shooter repeatedly said, "Should I pop him?"

39.    The Q45 pulled away but then immediately backed up.

40.    The driver-shooter fired a gun.

41.    Brown was unhurt but discovered that Scrubb had been shot.

42.    Brown described the perpetrators' Q45 as "gray or gray/beige a crazy color," or "either a dark gray or like a cream color."

43.    Brown described the bumper-passenger as a Black male with dark skin, 18-23 years old, 6'1" to 6'3" in height, with a clean-shaven face, eyeglasses, and hair styled in "corn braids."

44.    Brown described the driver-shooter as a Black male with light to medium skin, a medium build, and a light beard, aged 20-30.

45.     The following circumstances, among others, under which Brown observed the perpetrators, made it unlikely that he would be able to accurately observe and remember their fine facial features and thus later make an accurate identification:

a.     Brown needed eyeglasses to correct his impaired distance vision but was not wearing them;

b.     Brown had consumed multiple alcohol drinks and was intoxicated;

c.     Brown had smoked marijuana;

d.     Brown had not slept for many hours and was fatigued;

e.     it was nighttime and dark outside;

f.     to the extent that light coming from artificial overhead lights illuminated the perpetrators' faces, these lights created shadows that distorted Brown's perception of the perpetrators' faces; and

g.     the bumping incident, the ensuing argument between the bumper-passenger and Scrubb, and the shooting were stressful for Brown.

**The Individual Defendants conduct an initial investigation.**

46.     Defendant Anthony Pitre was assigned as the lead detective in the investigation of the shooting.

47.     Two days after the shooting, Pitre had no leads.

48.     He requested a "lawman search" from the NYPD Auto Crime Division for a listing of Infiniti Q45s in Kings County that were gray, white, or cream in color.

49.     The search produced more than 200 results.

50.     However, the Individual Defendants never investigated any of these Q45s that matched, at least in part, Ernest Brown's description of the perpetrators' car.

51.     On December 28, 1999, a patrol officer stopped an Infiniti Q45, allegedly for an illegal lane change.

6

52.    The police identified one of the occupants as Maurice Mayo of 67 Stuyvesant Avenue in Brooklyn.

53.    This Q45 was *gold*, matching none of the colors Brown had mentioned when describing the Q45 driven by the perpetrators.

54.    Nevertheless, from this point on in the police investigation, the Individual Defendants began to focus exclusively on members of Maurice Mayo's family.

55.    They focused in particular on Kareem Mayo, because they learned that Kareem Mayo was suspected in a recent shooting in a neighboring precinct (for which he never was indicted).

56.    Kareem Mayo's only apparent connection to the gold Q45 was that he was Maurice Mayo's nephew.

**After Ernest Brown fails to identify Donnell Perkins in a photo array, the Individual Defendants manufacture Brown's lineup identification of Perkins and, based solely on that false evidence, initiate Perkins's prosecution.**

57.    Pitre obtained a photo array containing Kareem Mayo's photo, which other detectives already had prepared in connection with the shooting in the neighboring precinct.

58.    In a DD5, Pitre falsely claimed that he had prepared this photo array from scratch.

59.    On the night of December 30, 1999, Defendants Pitre and McNulty drove Ernest Brown to 67 Stuyvesant Avenue.

60.    While at 67 Stuyvesant Avenue, Pitre and McNulty asked Brown to see if he could identify any individual entering or leaving the house.

61.    This was a highly suggestive procedure, as Pitre and McNulty's instruction to Brown implied that they had reason to believe that at least one of the perpetrators was connected to 67 Stuyvesant Avenue.

7

62.     The gold Infiniti Q45 that was registered to Maurice Mayo, who lived at 67 Stuyvesant Avenue, was parked across the street from the house.

63.     Pitre and McNulty told Brown to look at this automobile and see if he recognized it.

64.     They did this even though they knew the gold Q45 did not match any of the descriptions Brown had given of the color of the perpetrators' car.

65.     As a result of this highly suggestive show-up procedure, Brown told Pitre and McNulty that the gold car was the same make and color as the perpetrators' car, even though Brown had never described the perpetrators' car as gold.

66.     Later the same day, according to a DD5 prepared by Pitre, Brown identified Kareem Mayo, then 25 years old, in the photo array as the driver-shooter.

67.     Also on December 30, Pitre obtained photographs of numerous other individuals belonging to or associated with the Mayo family, including Donnell Perkins.

68.     Perkins is Kareem Mayo's much younger cousin.

69.     Pitre initially generated two photo arrays from the set of photographs he had obtained.

70.     One photo array contained a photograph of Antoine Mayo and the other photo array contained a photograph of Jermel Mayo.

71.     Both men looked far more like Brown's description of the bumper-passenger than Perkins did.

72.     However, Pitre never showed either of these photo arrays to Brown.

73.     On December 31, after he had generated the Antoine Mayo and Jermel Mayo photo arrays, Pitre generated a photo array containing a photograph of Perkins.

74.    Neither Pitre nor the prosecution disclosed to the defense for more than 20 years that Pitre had created photo arrays of two suspects who looked more like Brown's description than Perkins did and that Pitre had never shown Brown these photo arrays.

75.    In fact, testifying at a pretrial suppression hearing in 2001, Pitre falsely denied that he had created any photo arrays from the Mayo family photographs except for the one containing Perkins's photograph.

76.    Pitre prepared a photo array containing Perkins's photograph even though he knew that Perkins's physical characteristics were inconsistent with Brown's description of the bumper-passenger in several significant ways, including the following:

    a.    Brown was certain the bumper-passenger wore eyeglasses, but police records showed Perkins did not wear eyeglasses;

    b.    Brown described the bumper-passenger as 6'1", 6'2", or 6'3", but police records showed that Perkins was just 5'8";

    c.    Brown described the bumper-passenger as being clean shaven, but police records showed Perkins had a mustache and a goatee;

    d.    Brown described the bumper-passenger as 18-23 years old, but Perkins was only 17; and

    e.    Brown described the bumper-passenger as having dark skin, whereas Perkins had at most a medium complexion.

77.    Pitre further knew that Brown had repeatedly stated that he had seen the bumper-passenger exiting the Po'k Knockers bar before bumping Scrubb, but Pitre had learned during his investigation that the bar catered to a significantly older clientele and did not admit minors, such as Perkins, then aged only 17.

78.    Pitre later admitted that, for these reasons, he did not show Perkins's photograph to bar patrons or employees to see if they would identify Perkins as having been at the bar the night of the shooting.

9

79.    Recognizing that Perkins could not have been the bumper-passenger, Pitre did not immediately show Perkins's photograph to Brown.

80.    Instead, for a week after Pitre prepared this photo array, Pitre and other officers repeatedly stopped Perkins's car and pressured him, unsuccessfully, to reveal the whereabouts of his cousin Kareem.

81.    During these car stops, Pitre and the other officers observed that Perkins—contrary to Brown's description of the bumper-passenger—was not wearing eyeglasses, did not have a corrective-lenses designation on his driver's license, did have facial hair, was much shorter than the man Brown had described, looked younger than 18-23, and did not have a dark complexion.

82.    On January 6, 2000, despite knowing that Perkins was not the person described by Brown, Pitre attempted to increase the pressure on Perkins to give up Kareem Mayo by showing Brown the photo array containing Perkins and trying to obtain an identification.

83.    However, as Brown would later testify under oath, Brown did not recognize anyone in this photo array.

84.    Pitre did not document or disclose Brown's failure to identify Perkins in the photo array.

85.    Instead, Pitre created a photo array form that falsely memorialized that Brown had selected Perkins's photo.

86.    Pitre also created a DD5 that falsely stated that Brown had selected Perkins's photo.

87.    This DD5, like many of Pitre's DD5s, was not numbered.

88.     This DD5, like many of Pitre's DD5s, was not approved or signed by Pitre's supervisor.

89.     As a result, Pitre was able to later insert this and other DD5s into his investigative file without it being apparent that he had fabricated the information in the DD5.

90.     The same day that Brown failed to recognize Perkins in the photo array, Defendants Pitre and Salem again pulled over Perkins in his car and drove Perkins to a police precinct.

91.     At the precinct, Pitre and other detectives again pressured Perkins to tell them where Kareem Mayo was.

92.     When Perkins told them he did not know Kareem Mayo's whereabouts, Pitre threatened that he would put Perkins in a lineup and that Perkins would be pointed out and would spend at least two years in jail before he would even have a trial.

93.     Perkins still did not give the detectives any information.

94.     Just as Pitre had warned Perkins, he, together with the other Individual Defendants, then conducted a lineup that was so suggestive that Ernest Brown's identification of Perkins was virtually a foregone conclusion.

95.     First, by conducting the lineup after Pitre had showed Brown the photograph of Perkins in the photo array, the Individual Defendants ensured that Brown could deduce that Perkins—the only person in the lineup whose photo also had been in the photo array—was the police suspect.

96.     Second, conducting the lineup after Pitre had shown Brown the photo array containing Perkins's photo also made Perkins's face look familiar to Brown, which greatly

increased the likelihood that Brown would falsely identify Perkins, whether Brown knew that Perkins was the police suspect or not.

97.    Showing Brown the lineup just hours after showing him the photo array, when Perkins's photograph was still fresh in Brown's memory, exacerbated this suggestive influence.

98.    Third, while the hair of all five lineup fillers was hidden by hats, the Individual Defendants allowed Perkins's braids—the hairstyle that Brown had described the bumper-passenger as wearing—to be clearly visible to Brown when Brown viewed the lineup.

99.    Fourth, the Individual Defendants placed around Perkins five fillers who were between 7 and 12 years older than the 17-year-old Perkins and weighed between 30 and 80 pounds more than he did.

100.    Unsurprisingly, under these extraordinarily suggestive circumstances, Brown identified number five, Perkins, as the bumper-passenger.

101.    After having caused Brown to identify Perkins, the Individual Defendants showed to Brown, and had Brown sign, a Line-Up Report.

102.    In this Line-Up Report, the Individual Defendants had memorialized that the person in position number five, who was Perkins, was the police "SUBJECT."

103.    The report thus confirmed for Brown that he had selected the police suspect, reinforcing his belief that he had made a correct identification.

104.    The Individual Defendants then caused the initiation of Perkins's prosecution by providing false, misleading, and incomplete information and documentation to the DA's Office.

105.    On January 7, 2000, Pitre swore to the truthfulness of a Criminal Court complaint falsely accusing Perkins of murder.

106.    At his Criminal Court arraignment on January 7, 2000, Perkins was remanded without the option to pay bail.

107.    He remained in custody for the next 21 and one half years.

108.    Brown and Pitre testified before a grand jury that Brown had viewed a lineup and identified Perkins as the bumper-passenger.

109.    Based on this testimony, on or about January 14, 2000, a grand jury indicted Perkins on one count of second-degree murder.

110.    Before the grand jury returned its indictment, neither the Individual Defendants nor the prosecution informed the grand jury or the defense of, *inter alia*, the following information:

    a.    Brown's description of the bumper-passenger differed from Perkins's actual appearance in the numerous material ways set forth in ¶ 76;

    b.    while Brown swore that the bumper-passenger had come out of Po'k Knockers before bumping into Scrubb, Pitre had learned that the bar strictly prohibited minors and catered to an older clientele;

    c.    Brown had identified a Q45 belonging to the Mayo family as resembling the car used by the perpetrators only after a highly-suggestive show-up procedure at which detectives had directed Brown's attention to that car;

    d.    the Q45 that Brown claimed resembled the car used by the perpetrators was *gold*, whereas Brown had, immediately after the shooting, described the perpetrators' car as gray;

    e.    detectives had decided to put Perkins in a lineup only after pulling him over multiple times and attempting to pressure him, without success, to give up Kareem Mayo's whereabouts and then threatening Perkins that he would be picked out of the lineup if he continued not to tell them where Kareem Mayo was;

    f.    detectives had prepared at least two photo arrays containing suspects who matched Brown's description of the bumper-passenger more closely than Perkins did;

    g.    Ernest Brown had viewed a photo array containing Perkins's photo but failed to identify him as one of the perpetrators;

h.     the lead detective, Pitre, had prepared a photo array form and DD5 that falsely represented that Brown had identified Perkins upon viewing the array;

i.     Ernest Brown had identified Perkins in a lineup just hours after viewing the photo array containing Perkins's photo and thus had been able to deduce that Perkins, the only person who appeared in both the array and the lineup, was the police suspect;

j.     at the lineup, while the hair of all five lineup fillers was hidden by hats, Perkins's braids, the hairstyle that Brown had described the bumper-passenger as wearing, were clearly visible to Brown;

k.     the five fillers placed around Perkins at the lineup were between 7 and 12 years older than old Perkins and weighed between 30 and 80 pounds more than he did; and

l.     immediately after the lineup, police had shown Brown, and had Brown sign, a Line-Up Report that informed Brown that he had selected the police "SUBJECT," thus reaffirming for Brown the supposed correctness of his identification.

**Perkins is convicted at trial based solely on the manufactured eyewitness-identification testimony of Ernest Brown.**

111.    In April 2001, Perkins was jointly tried with Kareem Mayo.

112.    The only evidence against Perkins and Mayo consisted of Ernest Brown's testimony identifying Perkins and Mayo as the perpetrators.

113.    Whereas Brown had told the detectives only that the gold Q45 registered to Maurice Mayo was the same make and color as the perpetrators' car, ADA Alfred De Ingeniis elicited from Brown false testimony that Brown somehow had recognized the gold Q45 as *the* same car the perpetrators had used during the shooting.

114.    ADA De Ingeniis had previously elicited Brown's sworn testimony, given in two separate grand jury presentations, that Brown had seen the bumper-passenger come out of the Po'k Knockers bar before bumping Reuben Scrubb.

115.    ADA De Ingeniis had even asked Brown in one of those presentations whether Brown had previously seen "the person that came out of the bar."

116.    However, De Ingeniis subsequently became aware that Pitre had learned that Po'k Knockers catered to an older clientele and did not admit minors, making it highly unlikely that the person Brown had identified as the bumper-passenger, the 17-year-old Perkins, had come out of the bar as Brown claimed.

117.    Before Perkins and Mayo's trial began, De Ingeniis knew that Brown had agreed to testify, contrary to his multiple pretrial statements, that he had not seen where the bumper-passenger came from.

118.    De Ingeniis did not timely disclose to the defense that Brown had contradicted his original sworn statements that he had seen the bumper-passenger come from the bar.

119.    In his opening statement at Perkins and Mayo's trial, ADA De Ingeniis told the jury, with reference to Brown and Scrubb, "they don't know if [the bumper-passenger] left from the bar because they didn't see him in there."

120.    Brown then gave the following false testimony in response to ADA De Ingeniis's leading questions:

> Q    What happened as you and Rubin [sic] were talking about which way to get home?
>
> A    Someone came from his left-hand side and bumped him.
>
> Q    When you say someone came, did you see where that person came from?
>
> A    No.
>
> Q    Did you see that person inside the bar previously?
>
> A    No.

121.    Brown then identified Perkins in the courtroom as the bumper-passenger.

15

122.    ADA De Ingeniis began his summation by forcefully arguing, contrary to Brown's

sworn grand jury testimony, that Brown had not seen the bumper-passenger emerge from the bar:

>    I want to start with Donnell. The first time Ernest Brown had an
>    opportunity to see Donnell Perkins was right after the bump.
>
>    Let's clear up something right away, ladies and gentlemen, and
>    *Ernest Brown is clear about this, he does not see where Donnell Perkins
>    comes from*, and you can have that read back to you. He sees Donnell
>    Perkins bump or, excuse me, he just sees the bump and that's it. He
>    doesn't see him coming from the bar. Doesn't say he saw him that night.
>    We don't know where Donnell Perkins came from. We don't know if he
>    was in the bar.
>
>    . . .
>
>    Ernest Brown is clear, he doesn't see where Donnell Perkins comes
>    from. The first opportunity he gets to see him is right after that bump.

123.    Based on Brown's identification testimony and ADA De Ingeniis's misleading

summation arguments, the jury convicted Perkins and Mayo of murder.

124.    The court sentenced Perkins to 22 years to life in prison.

### The vacatur of Perkins's conviction and dismissal of the indictment

125.    In September 2020, Perkins and Mayo jointly moved to vacate their convictions

under N.Y. C.P.L. § 440.10.

126.    They argued, *inter alia*, that they were entitled to a new trial based on newly

discovered evidence that Ernest Brown, who had testified at trial that he wasn't wearing

eyeglasses when the shooting occurred and didn't need eyeglasses except for reading, in fact had

significantly impaired distance vision at the time of the shooting and had lied about his eyesight.

127.    On or about July 1, 2021, Perkins was granted parole and released from prison to

life parole.

128.    On January 23, 2023, after a lengthy evidentiary hearing, the New York State

Supreme Court, Kings County, granted the 440 motion and vacated Perkins's and Mayo's

convictions.

129.    On June 16, 2023, the same court granted the KCDAO's motion to dismiss the

indictment against Perkins and Mayo.

130.    Before the favorable termination of his prosecution, Donnell Perkins spent 21

years, 5 months, and 26 days in jail or prison, and 1 year, 6 months, and 23 days on parole.

## FIRST CAUSE OF ACTION

**Malicious prosecution under New York state law. All defendants.**

131.    Plaintiff repeats and realleges each allegation contained in the preceding

paragraphs as if fully set forth herein.

132.    The Individual Defendants, acting individually and in concert with others, acted

knowingly, willfully, intentionally, and with actual malice to initiate and/or to continue criminal

proceedings against Plaintiff.

133.    They did so without probable cause and intentionally caused Plaintiff to be

deprived of his liberty.

134.    The proceedings terminated in Plaintiff's favor.

135.    Defendant City of New York is liable for Plaintiff's prosecution and damages

under the principle of *respondeat superior*.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983. Malicious prosecution in violation of the Fourth, Fifth, and Fourteenth Amendments. All Individual Defendants.

136.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

137.    The Individual Defendants are liable for their violations of Plaintiff's constitutional rights, and all of Plaintiff's resulting damages, in accordance with 42 U.S.C. § 1983 and the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

## THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983. Evidence fabrication in violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments. All Individual Defendants.

138.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

139.    The Individual Defendants, acting individually and/or in concert with others, acted deliberately, willfully, recklessly, and/or with deliberate indifference to the truth, to fabricate or manufacture false or patently unreliable witness statements and false or materially misleading documentary evidence implicating Plaintiff in the crime.

140.    The evidence they fabricated or manufactured includes but is not limited to:

   a.    Ernest Brown's statement during the police investigation that the gold Q45 registered to Maurice Mayo was the same make and color as the car driven by the perpetrators;

   b.    Brown's testimony during trial that the gold Q45 Maurice Mayo *was* the car driven by the perpetrators;

   c.    the photo array form falsely purporting to document that Ernest Brown had identified Perkins in the array;

    d.      Pitre's DD5 falsely claiming that Brown had identified Perkins in the photo array;

    e.      Brown's lineup identification of Perkins and statement that Perkins acted in concert with the shooter to commit the murder;

    f.      police documentation of this identification and statement;

    g.      Brown's identification of Perkins in the grand jury;

    h.      Brown's courtroom identification of Perkins at trial; and

    i.      the Individual Defendants' misleading omission from their police reports of:

        i.      their preparation of at least two photo arrays containing photographs of suspects who resembled the bumper-passenger more closely than Perkins did;

        ii.      the multiple instances in which they stopped Perkins's car before they finally brought Perkins to the precinct to be interrogated and placed in a lineup; and

        iii.      the threats they made that Perkins would be identified in the lineup if he did not provide them with Kareem Mayo's whereabouts.

141.    The Individual Defendants forwarded or caused the forwarding of such fabricated or manufactured evidence to prosecutors for use against Plaintiff during a criminal prosecution.

142.    The Individual Defendants knew the fabricated or manufactured evidence would be likely to influence a jury's decision at trial.

143.    As a result of the Individual Defendants' forwarding of the fabricated or manufactured evidence to KCDAO prosecutors, the latter initiated a criminal prosecution of Plaintiff and he lost his liberty.

144.    The Individual Defendants' misconduct violated Plaintiff's right to be free from unreasonable seizure, as guaranteed by the Fourth Amendment to the United States Constitution, and his rights to procedural and substantive due process and a fair trial, as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

145.    The above misconduct was outrageous and shocking to the conscience.

146.    The Individual Defendants are liable for their violation of Plaintiff's constitutional rights, and all of Plaintiff's resulting damages, in accordance with 42 U.S.C. § 1983.

### FOURTH CAUSE OF ACTION

**42 U.S.C. § 1983. Withholding of exculpatory evidence that was shocking to the conscience and caused Plaintiff's loss of liberty, in violation of the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments ("*Russo* Claim"). All Individual Defendants.**

147.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

148.    The Individual Defendants knew that Plaintiff's prosecution, including Plaintiff's pretrial detention on murder and related charges in lieu of bail, was based upon a slim reed: Ernest Brown's unreliable lineup identification of Plaintiff under highly questionable circumstances.

149.    The Individual Defendants also knew or should have known that, under New York law, the strength of the prosecution's case was a significant bail factor and that the court likely would have released Plaintiff on a reasonable bail had it known of the powerful evidence of Plaintiff's likely innocence—including but not limited to the information set forth in ¶ 110.

150.    Yet the Individual Defendants unconscionably withheld this exculpatory information from the KCDAO, the court, and the defense, causing Plaintiff's unjustified detention.

151.    This conduct was shocking to the conscience.

152.    It violated Plaintiff's constitutional rights to be free of unlawful or unreasonable seizure under the Fourth and Fourteenth Amendments, to reasonable bail under the Eighth and Fourteenth Amendments, and to due process of law under the Fifth and Fourteenth Amendments.

153.    By virtue of the foregoing, the Individual Defendants are liable for their violation of Plaintiff's constitutional rights pursuant to 42 U.S.C. § 1983 and Plaintiff's resultant injuries.

**FIFTH CAUSE OF ACTION**

**42 U.S.C. § 1983. Withholding of information favorable to the defense, in violation of the Fifth, Sixth, and Fourteenth Amendments, and *Brady v. Maryland*, 373 U.S. 83 (1963). All Individual Defendants.**

154.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

155.    At all relevant times, Plaintiff had a clearly-established right—under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; *Brady v. Maryland*, 363 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); and their progeny—to timely disclosure by the prosecution of all material information that tended to show his innocence or that impeached the credibility of the prosecution's witnesses against him.

156.    In order to safeguard this right, police officers, including the Individual Defendants, had an obligation to timely disclose all potential *Brady* evidence and information to the prosecution so that it could make the requisite disclosure to the defense and the defense could investigate the information and make use of it at a suppression hearing or trial.

157.    The Individual Defendants violated this obligation by failing to timely disclose to the prosecutor in charge of Plaintiff's criminal prosecution various items of *Brady* material, including but not limited to those items and information described in ¶ 110(f)-(h), and the information that, before trial, Brown had given statements contradicting his sworn grand jury testimony that he had seen the bumper-passenger come out of the Po'k Knockers bar before bumping Scrubb, instead now claiming that he had not seen where the bumper-passenger had come from.

158.    These items and information that the Individual Defendants withheld from the prosecutor, and thus from the defense—either completely or until it was too late for the defense to make effective use of them at the pretrial hearing and at the trial—were favorable to the defense.

159.    They were material to the outcomes of the pretrial suppression hearing and the trial at which Plaintiff was convicted.

160.    In withholding the aforementioned information favorable to Plaintiff, the Individual Defendants acted deliberately, intentionally, willfully, recklessly, negligently, and/or with deliberate indifference to Plaintiff's constitutional right to due process and a fair trial or to the effect of such misconduct upon Plaintiff's constitutional rights.

161.    But for the Individual Defendants' withholding of information favorable to Plaintiff, there is a reasonable likelihood that Plaintiff would have received a more favorable outcome to his trial.

162.    By virtue of the foregoing, the Individual Defendants are liable for his violation of Plaintiff's constitutional rights pursuant to 42 U.S.C. § 1983 and Plaintiff's resultant injuries.

## SIXTH CAUSE OF ACTION

**Violations of rights under N.Y.C. Admin. Code §§ 8-802–8-803.
All Defendants.**

163.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

164.    Pursuant to N.Y.C. Admin. Code §§ 8-802–8-803, the Individual Defendants and their employer, the City of New York, are liable for their aforementioned violations of Plaintiff's rights, for his actual damages, and for punitive damages.

## SEVENTH CAUSE OF ACTION

**42 U.S.C. § 1983 and N.Y.C. Admin. Code §§ 8-802–8-803.
Failure to intervene. All Individual Defendants.**

165.     Plaintiff repeats and realleges each allegation contained in the preceding
paragraphs as if fully set forth herein.

166.     Alternatively, the individual defendants had an affirmative duty to Plaintiff to
protect his above-mentioned constitutional and statutory rights from infringement by other
government officials.

167.     Each of the Individual Defendants knew that Plaintiff's constitutional and
statutory rights would be violated if he did not intervene to prevent such violations.

168.     Each of the Individual Defendants had reasonable opportunities to intervene to
prevent such infringement of Plaintiff's constitutional and statutory rights.

169.     Nevertheless, each of the Individual Defendants deliberately, willfully, recklessly,
and/or with deliberate indifference failed to take reasonable steps to intervene.

170.     As a result of the Individual Defendants' failure to intervene, Plaintiff's liberty
was infringed or curtailed, in violation of his Fourth, Fifth, Sixth, Eighth, and Fourteenth
Amendment rights and N.Y.C. Admin. Code §§ 8-802–8-803.

## EIGHTH CAUSE OF ACTION

**42 U.S.C. § 1983 and *Monell*. Municipal liability for the
conduct of employees of the NYPD. Defendant City of New
York.**

171.     Plaintiff repeats and realleges each allegation contained in the preceding
paragraphs as if fully set forth herein.

172.     The Police Commissioner and police officers employed by the NYPD are agents
and employees of Defendant City of New York.

23

173.    Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner or his authorized delegates, during all times relevant to this Complaint, had final responsibility for training, instructing, supervising, and disciplining police officers and other employees of the NYPD with respect to the investigation and prosecution of criminal matters.

174.    The particular areas in which the Police Commissioner or his authorized delegates were responsible for training, instructing, supervising, and disciplining police officers and other employees of the NYPD included but were not limited to:

a.    the constitutional obligation, pursuant to the Fourth, Fifth, and Fourteenth Amendments to the Constitution, not to initiate or continue a prosecution, and to cause a criminal defendant's deprivation of liberty, without probable cause;

b.    the constitutional obligation, pursuant to the Fourth, Fifth, Sixth, and Fourteenth Amendments, not to fabricate or manufacture evidence, including false or unreliable identifications and false or materially misleading or incomplete reports, for use against criminal suspects and defendants in criminal prosecutions and trials;

c.    the constitutional obligation, pursuant to the Fifth, Sixth, and Fourteenth Amendments, to make timely disclosure of exculpatory or impeachment evidence ("*Brady* material") to the prosecution for disclosure in turn to a criminal defendant for use during pretrial proceedings and at trial; and

d.    the constitutional obligation not to give false or misleading testimony.

175.    With respect to the constitutional obligation of police officers to timely disclose *Brady* material, before Mr. Perkins's arrest and the initiation of his prosecution in 2000, the NYPD provided no training at all.

176.    Plaintiff's counsel has deposed numerous police officers and detectives in other lawsuits concerning their training and their knowledge of *Brady* disclosure requirements as of the late 1990s; virtually all such witnesses have testified that they received no *Brady* training and had no idea what "*Brady*" is or means.

24

177.    Similarly, such witnesses have testified that they received no training to record exculpatory or impeachment information in their reports, to disclose such information to prosecutors, or to follow up exculpatory leads. These deposition transcripts are in the possession of Plaintiff's counsel and of the City of New York. *See, e.g.*, Deposition of Homicide Det. Vincent Gerecitano, *Collins v. City of New York*, No. 11-cv-766 (FB) (E.D.N.Y.), at p. 43 ("The *Brady* Rule, I don't know what that is."); *id*. at p. 311 ("no training that I could think of" regarding making a record that a cooperating witness was going through drug withdrawal, explaining, "I could see somewhere down the road having a conversation with the district attorney saying what the fuck did you put that down for, how do you feel this is relevant, the guy is giving you information and you're knocking him out of the water."); Deposition of Det. Jose R. Hernandez, *Collins*, *supra*, at pp. 33-34, 36 ("never heard of" *Brady* and cannot recall any training about how to evaluate witness credibility); Deposition of NYPD Inspector Paul Amundson, *Zahrey v. City of New York, et al.*, No. 98 Civ. 4546 (DLP) (S.D.N.Y.), at p. 107 (received no *Brady* training); Deposition of then-Capt. Robert Boyce, *Zahrey*, *supra*, at pp. 20-22, 35-36 (never heard of "*Brady v. Maryland*," received no training concerning documenting or disclosing to defense counsel exculpatory or impeachment evidence, and could not recall any training about how to evaluate the credibility of cooperators or informants); Deposition of Det.-Sgt. Michael McWilliams, *Zahrey*, *supra*, at pp. 28-29, 35-36, 37-38 ("I don't know what *Brady v. Maryland* is" and received no *Brady* training); Deposition of Det. Daniel Toohey, *Poventud v. City of New York*, No. 07-cv-3988 (DAB) (S.D.N.Y.), at pp. 145-46 (did not know what "*Brady* material" is, recalled no such training, had no training to forward to the prosecutor evidence favoring the suspect).

178.    During all times material to this complaint, the City, through its policymaking officials in the NYPD, owed a duty to the public at large and to Plaintiff to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by NYPD employees that would result in the violation of the above-mentioned constitutional obligations.

179.    These policymakers knowingly and intentionally breached, or were deliberately indifferent to, this duty.

180.    Furthermore, these policymakers created substantial incentives for their employees to commit the above-described constitutional violations, by pressuring police officers to close cases through arrests, indictments, and convictions.

181.    The aforesaid deliberate or de facto policies, procedures, regulations, practices, and/or customs (including the failure to properly instruct, train, supervise, and/or discipline employees) were implemented or tolerated by policymaking officials for Defendant City—including but not limited to the Police Commissioner—who knew, or should have known:

     a.    to a moral certainty that such policies, procedures, regulations, practices, and/or customs concerned issues that regularly arose in the investigation of criminal cases;

     b.    that such issues presented NYPD employees with difficult choices of the sort that instruction, training, supervision, and discipline would make less difficult;

     c.    that NYPD employees facing such issues had strong incentives to make the wrong choices, especially given the pressure placed on NYPD employees to make arrests, close cases, and secure indictments and convictions;

     d.    that NYPD employees had a history of making wrong choices in such matters; and

     e.    that the wrong choice by NYPD employees concerning such issues would frequently cause the deprivation of the constitutional rights of an accused person and cause him constitutional injury.

182.    At the time of Plaintiff's arrest and prosecution, NYPD policymaking officials were on notice of the risk of misconduct by NYPD employees that would violate the constitutional obligations identified in ¶ 174, based on the following circumstances, among others:

a.    credible allegations, many substantiated by judicial decisions, that NYPD detectives had wrongfully withheld material evidence, manufactured false or unreliable identification evidence and other evidence, and/or knowingly given false or misleading testimony;

b.    civil lawsuits, some of which resulted in substantial civil settlements, credibly alleging that NYPD detectives had falsified, exaggerated, or withheld material evidence, or conducted searches or made arrests without probable cause;

c.    numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division discussing the difficult issues that regularly arise for police officers under *Brady*, during eyewitness-identification procedures, and in other phases of criminal investigations;

d.    judicial decisions directly criticizing the NYPD for failing to train and supervise officers in their *Brady* obligations and for failing to adopt adequate *Brady* disclosure policies, *see, e.g.*, *Carter v. Harrison*, 612 F. Supp. 749 (E.D.N.Y. 1985) (McLaughlin, J., adopting the Report and Recommendation of then–M.J. Scheindlin), and putting the NYPD on notice that the City could be held liable for its failure to adequately train police officers regarding their obligations to provide truthful testimony and to disclose evidence that favors criminal defendants under *Brady*, *see Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), and *Carter*, 612 F. Supp 749;

e.    formal reports of the New York City Comptroller's Office and the Bar Association of the City of New York criticizing the NYPD and the New York City Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other remedial action;

f.    the 1994 Mollen Commission Report, based on a two-year investigation and a year of hearings, finding a "culture of corruption" in the NYPD, pervasive misconduct by NYPD officers and detectives including the fabrication of evidence and testimony, and tolerance of this culture and misconduct by the NYPD's leaders; and

       g.    the inherent obviousness of the need to train, supervise, and discipline police officers in such obligations to counteract the pressure on officers to close cases and to obtain arrests and convictions.

183.    Many of the aforementioned unlawful practices, their toleration by police policymakers, and the culture of corruption that ensued, were documented before Plaintiff's prosecution and conviction, in the aforementioned Mollen Commission Report.

184.    The Mollen Commission was formed in 1992 after widespread reports of police corruption, including, among other things, the fabricating of evidence in criminal investigations.

185.    The Mollen Commission "interviewed scores of former and current police officers and supervisors." Mollen Commission Report at 36. It found that

> [o]fficers . . . commit falsification to serve what they perceive to be "legitimate" law enforcement ends—and for ends that many honest and corrupt officers alike stubbornly defend as correct. In their view, regardless of the legality of the arrest, the defendant is in fact guilty and ought to be arrested. Officers reported a litany of manufactured tales.
>
> . . . .
>
> . . . Frustrated by what they perceive to be unrealistic rules of law and by their own inability to stem the crime in their precincts through legal means, officers take the law into their own hands. And police falsification is the result.

*Id.* at 38.

186.    The report noted: "Several officers . . . told us that the practice of police falsification . . . is so common in certain precincts that it has spawned its own word: 'testilying.'" *Id.* at 36.

187.    In one NYPD unit, the Commission found that "the unit's commanding officer not only tolerated, but encouraged, th[e] unlawful practice" of "falsif[ying] documents" and "committ[ing] testimonial perjury." *Id.* at 39.

188.    The Commission concluded that there existed

> a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful. . . . This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."

*Id.* at 41.

189.    The Commission also noted that

> the Department's top commanders must share the blame. . . . We are not aware of a single instance in which a supervisor or commander has been sanctioned for permitting perjury or falsification on their watch.

> Nor do we know of a single, self-initiated Internal Affairs Division investigation into patterns of police perjury and falsification. . . . Internal Affairs over the last decade had no record of the number of falsification allegations brought against officers throughout the Department or in a particular precinct or command. There is no evidence that anyone in the Department's chain of command had focused on eliminating this practice, including past Police Commissioners and Internal Affairs chiefs, *who apparently turned a blind eye to unlawful practices that were purportedly committed to fight crime and increase arrest statistics*.

*Id.* at 41-42 (emphasis added).

190.    Despite the revelations of the Mollen Commission Report, the types of constitutional violations documented in the report persisted in the following years, with little to no effort by NYPD policymaking officials to address them.

191.    Two detectives whose repeated misconduct NYPD policymaking officials repeatedly turned a blind eye to were Louis Scarcella and Stephen Chmil.

192.    In 1988, in the murder prosecution of James Jenkins, Brooklyn Supreme Court Justice Francis X. Egitto found, after a hearing, that the "pretrial identification procedures employed by [Scarcella] were unduly suggestive and prejudicial to defendant."

193.    The decision detailed how Scarcella, in violation of police practice and constitutional requirements, had shown a single photo of Jenkins to two witnesses instead of a photo array.

194.    It also detailed how, upon Jenkins's arrest, Scarcella had brought five witnesses to the precinct and conducted the following improper identification procedure:

> The witnesses were not separated prior to viewing defendant. Indeed, they were individually and collectively told by Detective Scarcella that "we arrested the man we believe was responsible for the death of the deceased; I would like you to take a look at him." After each witness individually viewed the defendant through a two-way mirror, that witness was returned to the room where his fellow witnesses waited. No effort was made to keep the witnesses from discussing their viewing of defendant who was observed, alone, in a room.

195.    The court concluded:

> The practices here utilized represent *a classic illustration of what not to do in conducting pretrial identification procedures*. It was unnecessary to display to the witnesses a single photo; no exigent circumstances justified a showup; and no argument can be advanced to support Detective Scarcella's telling the witnesses that the police had "arrested the man we believe was responsible for the death of the deceased." Based upon this *abysmal showing, and the Police's patent disregard for accepted identification procedures*, the court is left no choice but to exclude from trial all mention of such practices [emphasis added].

196.    Notwithstanding Justice Egitto's harsh criticism, the NYPD conducted no investigation of Scarcella and took no disciplinary action against him.

197.    In 1990, David Ranta was charged with murder in the high-profile shooting death of a beloved Orthodox rabbi earlier that year.

198.    Scarcella and his frequent partner Chmil were assigned to investigate the killing.

199.    At a pretrial hearing, Scarcella testified that several months after the shooting, he spoke to a man named Alan Bloom, who had been arrested near the shooting location.

200.    Bloom was facing numerous robbery charges and many years in prison and was incarcerated at Rikers Island.

201.    Scarcella testified that Bloom had implicated men by the names of David and Steve but did not give last names.

202.    Scarcella testified that he then located photos of David Ranta and Steve Sicar, placed them in a photo array or photo arrays, and showed them to Bloom, who identified both men as having participated in the shooting.

203.    At the hearing, Justice Egitto expressed his incredulity:

> I'm still interested when a person gets arrested, when we have a police officer who tells us the name Steve comes up and he goes ahead to the Catch Unit and picks out a picture of Ranta and Steve when nobody told him Steve's last name. I don't know if he's a medium of some kind. He also picked out the name of Ranta before anyone told him Ranta's last name. From what I gather he heard the name David. Lo[] and behold they are the right people.

> It stretches the credulity of the court in how these pictures are obtained.

204.    Scarcella and Chmil also manufactured at least one lineup identification of Ranta by blatantly suggesting to a witness whom he should pick.

205.    When an audio recording of the lineup came to light at trial, the defense alleged on the record that the recording established the detectives' misconduct during the lineup.

206.    Justice Egitto again admonished Scarcella, and now Chmil too, on the record:

> The more I hear this the more I am disillusioned with the work of the detectives.

> Here a young man of 14, 15 years of age says specifically I *think* it is number three. The cop, probably Scarcella or Chmil, says, okay, number three. From there on in the kid goes along with the number three . . . .

> He said, I *think* it is number three, which is not identifying any one [emphasis added].

31

207.    This witness later revealed that a detective had told him to "pick the guy with the big nose."

208.    Justice Egitto made the following additional remarks about Scarcella's and Chmil's conduct during the Ranta investigation:

> I think what they have done in this case, in my opinion, is decide that Mr. Ranta was the person, the guilty party, and then they went out of their way to make sure it tied up neatly in a package.
>
> . . . .
>
> [T]hey decide the case and that is the reason why a lot of our cases are being blown out when the People only have the police officers to rely upon for their statements, such as narcotics cases and gun cases. The detectives have to be taught here in New York State, unlike a lot of other places, we have a constitution. And they have to live up to it. . . . I think it is ridiculous the way cops take it upon themselves to be judge, jury, and partial executioner.
>
> . . . .
>
> I tell you this. In my opinion throughout this case the two detectives did all they could to tie it up in a neat package. . . . I don't think what they did and the manner in which they did it was, shall we say, absolutely fair.

209.    As a result of Scarcella's and Chmil's misconduct, Ranta was convicted.

210.    Despite Justice Egitto's comments, the NYPD conducted no meaningful investigation of their misconduct and took no meaningful action to discipline them.

211.    As a result, Ranta remained in prison until the DA's Office finally moved to vacate Ranta's conviction in 2013, after the *New York Times* exposed the misconduct of Scarcella and Chmil in numerous cases, including the Ranta case.

212.    NYPD policymakers also knew or should have known that in six different homicide prosecutions, Scarcella had used the false and inherently unbelievable "eyewitness"

identifications of suspects by a single witness, Teresa Gomez, who was addicted to crack cocaine and engaged in prostitution.

213.    In these and numerous other cases, Scarcella and Chmil pressured people addicted to drugs, who were highly susceptible to police pressure, to provide false evidence, or the detectives used unlawful means to coerce or fabricate confessions and false identification evidence.

214.    As a results of Scarcella's and Chmil's misconduct, numerous people were wrongfully convicted; many of them did not see their convictions vacated until decades later and some of them still sit in prison as a result of these detectives' misconduct.

215.    Scarcella was open about his attitude, saying:  "Are there rules when it comes to homicide? No. No, there are none. I lie to them. I will use deception. The bad guys don't play by the rules when they kill Ma and Pop, shoot them in the head, ruin the lives of their family. I don't play by the rules."

216.    One judge stated in overturning a conviction that Scarcella secured through his misconduct:

> The findings of this court are that *the assigned Detective, Louis Scarcella, was at the time of the investigation [in 1991] engaged in false and misleading practices*. The cases of David Ranta, Derrick Hamilton, Robert Hill, Alvena Jennette and Darryl Austin that were investigated by Scarcella and prosecuted contemporaneously with this case in the early nineties demonstrate this *pattern and practice. The pattern and practice of Scarcella's conduct which manifest a disregard for rules, law and the truth* undermines our judicial system and gives cause for a new review of the evidence.

*People v. Hargrove*, 49 Misc.3d 1208(A), at *8 (N.Y. Sup. Ct. Kings Cty. 2015) (emphasis added), *aff'd*, 162 A.D.3d 25 (2d Dep't 2018).

217.    After the *Hargrove* decision was issued in 2015, several more cases involving Scarcella were overturned based on his involvement in the police investigations.

218.    Based on the pervasive misconduct by Scarcella and Chmil in the above cases, and others, NYPD policymaking officials knew or should have known that the detectives were coercing confessions, manufacturing false or unreliable identification evidence, intentionally securing testimony that they knew to be false, giving false testimony themselves, and suppressing evidence favorable to criminal defendants which they knew they were obligated to disclose.

219.    Yet these policymaking officials failed to take meaningful steps to supervise or discipline Scarcella or Chmil to ensure that such misconduct did not continue.

220.    Instead, the NYPD treated Scarcella and Chmil as heroes for obtaining arrests and convictions at a blistering rate, thus sending a clear message to the entire NYPD police force that such misconduct would be not just tolerated but celebrated.

221.    Another of the many homicide detectives who engaged in repeated misconduct to which NYPD policymakers were deliberately indifferent was Michael Race.

222.    Race admitted that he investigated 750 murder cases but only one was "done the correct way, from A to Z."

223.    An NYPD colleague testified that Race

> had a reputation among detectives for feeding informants and witnesses details about crimes [and] that Race had a reputation of referring informants and witnesses to the TIPS hotline so they could collect rewards for information, which is a violation of police procedure because of the risk of kickbacks.

*Blake v. Race*, 487 F. Supp. 2d 187, 204 (E.D.N.Y. 2007).

224.    In the early 1990s, Race fed details to an informant, Dana Garner, and caused Garner to provide false statements and testimony leading to the arrests and prosecutions of Jeffrey Blake, Ruben Ortega, and Timothy Crosby.

225.    As a result of Garner's testimony, Blake was convicted of murder and sentenced to 36 years to life in prison, Ortega was convicted of murder and sentenced to 25 years to life in prison, and Crosby was convicted of felony assault and sentenced to 10 years to life in prison.

226.    In 1998, the KCDAO conceded that Garner was an unreliable witness and consented to the vacatur of Blake's conviction.

227.    In 1999, Garner signed a sworn statement recanting his accusations against Ortega and Crosby.

228.    That same year, a state judge vacated Crosby's conviction after finding Garner to be "a completely unreliable witness."

229.    In 2003, the Second Circuit vacated Ortega's conviction based on the unreliability of Garner's testimony.

230.    During civil litigation after Blake's conviction was vacated, Garner testified that Race had fed him the details that he provided in his statements to law enforcement and his eventual testimony in the Blake and Ortega cases, and that Race had threatened to charge him with crimes if he didn't implicate Blake and Ortega.

231.    Garner further testified that, during a lineup in the Blake case, a detective (he claimed he could not remember which one but knew that Race was at least present at the lineup) had told him to "just point out Jeffrey Blake." When Garner hesitated, the detective said, "I know you see him, just go ahead and point him out," and claimed Garner was "looking in [Blake's] direction . . . leaning in his direction."

232.    Despite Garner's evident unreliability as a witness and Race's reputation among his NYPD colleagues for feeding witnesses details about crimes, NYPD policymaking officials made no meaningful efforts to scrutinize Race's conduct in these investigations.

233.    Another case that illustrates the pattern of misconduct to which NYPD policymaking officials were deliberately indifferent is that of Zaher Zahrey.

234.    From 1994 to 1996, various senior detectives from the NYPD's Internal Affairs Bureau ("IAB") tried to frame Zahrey, an NYPD detective whom they suspected of being corrupt, for drug-related crimes including murder.

235.    The initially-assigned detective, Sgt. Robert Boyce, tape-recorded himself encouraging a state prisoner, Sidney Quick—whom Boyce knew to be serial robber and murderer addicted to crack—to adopt a false story that Boyce suggested to him implicating Zahrey in a series of murders, robberies, and drug deals.

236.    Boyce knew the story was false because it contradicted Quick's prior statements as well as independent police investigation.

237.    Boyce improperly promised to give Quick a "very, very, very sweet deal" and to "drive [Quick] home" if, contrary to Quick's prior statements, he'd "nail [Zahrey] to a cross" by accusing Zahrey of being present for and participating in these crimes.

238.    Later, when other IAB detectives could not corroborate Quick's manufactured claims, they convinced the United States Attorney's Office in Brooklyn to take over the case by concealing from that office the Quick audio recording.

239.    While Quick was refusing to cooperate with the federal authorities, the assigned IAB detective worked with a prosecutor from the KCDAO, Teresa Corrigan, to use secret coercion and under-the-table promises to induce Quick into agreeing to testify.

240.    Zahrey ultimately was acquitted after Boyce's investigative misconduct was exposed, but not until Zahrey had spent nearly nine months in jail on the false charges.

36

241.    Zahrey also was acquitted by an NYPD administrative judge who found that Boyce had led Quick to manufacture false allegations, a finding that was ratified by the Police Commissioner.

242.    Numerous articles appeared in *New York Times*, *New York* magazine, and other news media outlets exposing Boyce's misconduct.

243.    Yet despite the Police Commissioner's decision finding that Boyce committed misconduct by manufacturing a false case against Det. Zahrey, and despite all these news articles, NYPD policymakers continually promoted Boyce and eventually made him Chief of Detectives for the entire department.

244.    None of the other IAB personnel involved in the Zahrey case were disciplined either; instead, most were promoted.

245.    NYPD detectives also committed misconduct to obtain a corrupt murder conviction in 1995 in the Jabbar Collins case.

246.    Based upon an anonymous tip, Brooklyn detectives suspected Collins of having committed the botched robbery-murder of an Orthodox rabbi in 1994 in Williamsburg.

247.    The assigned homicide detective, Vincent Gerecitano, refused to accept the statements of a witness, Edwin Oliva—who was addicted and heroin and had just been arrested for an unrelated robbery in the same building where the rabbi's murder occurred—that he didn't know anything about the murder in question.

248.    Gerecitano detained Oliva, who was addicted to heroin, while he was going through withdrawal and was drooling, crying, exhausted, and desperate.

249.    Gerecitano coerced Oliva into signing a sworn written statement implicating Collins by refusing to summon medical assistance for Oliva while simultaneously promising Oliva that he would assist him in obtaining leniency from the KCDAO.

250.    Gerecitano omitted all these circumstances from his written police reports and never disclosed them to prosecutors.

251.    Later, before trial, Oliva recanted his coerced written statement, but prosecutors, evidently unaware of how Gerecitano had coerced Oliva's original sworn written statement, brought in Gerecitano to pressure Oliva to recant his recantation.

252.    Ultimately, in 2010, after Collins had spent 16 years in prison, prosecutors revealed Oliva's recantation, a federal judge ordered Collins released, and all charges were dismissed.

253.    At the time of Plaintiff's prosecution, NYPD policymaking officials were on notice of numerous instances, in addition to many of those discussed above, in which detectives improperly manufactured false or unreliable identifications in serious felony cases.

254.    After the arrest of Kareem Bellamy in 1994 for a stabbing death, NYPD Detective John Gillen conducted a lineup that included Bellamy.

255.    The only known eyewitness could not positively identify Bellamy.

256.    The detective took the witness into a private room for an improper private meeting, after which the witness suddenly claimed to be certain that Bellamy was the perpetrator.

257.    The witness's identification of Bellamy was a significant cause of Bellamy's conviction at trial.

258.    Bellamy was imprisoned for 14 years before his conviction was overturned and the charges against him dismissed.

259.    In 1996, the same Detective Gillen conducted a lineup in the investigation of Emmett Wheaton for a robbery.

260.    At the lineup, Wheaton heard Gillen saying to the witness, "Is it number four? Is it number four? Is it number four?"

261.    The witness picked out number four, Wheaton, and Wheaton was arrested and charged.

262.    Wheaton was acquitted at trial, but only after spending almost a year in jail.

263.    In 1999, NYPD detectives brought Jason Chambers, who had witnessed a murder, to view a lineup containing suspect Pierre Jenkins. Chambers picked Jenkins.

264.    The next year at a pretrial hearing, Chambers testified that he had picked Jenkins only after the detectives had told him: "you got to pick somebody. It was like, you got to get him. Pick somebody."

265.    Chambers then recanted his identification of Jenkins.

266.    Asked why he had picked Jenkins originally, Chambers said: "Because the detectives were, like, you had to pick somebody. I just wanted to go home and they were just, like, forcing me to pick somebody."

267.    After Chambers's recantation, prosecutors dropped the murder charges against Jenkins.

268.    In 1999, NYPD detectives investigating a deadly shooting conducted a lineup containing suspect Ronald Ambrose.

269.    Witness Edgar Rivera had, within an hour of the shooting, identified another man as the perpetrator.

270.    Rivera viewed the lineup containing Ambrose and did not identify Ambrose.

271.    Detective Jose Rosario then took Rivera into an office at the police precinct. Approximately 20 minutes later, Rosario and Rivera returned, and Rivera identified Ambrose as one of the shooters.

272.    After this identification, Ambrose was indicted for murder.

273.    Based on independent exculpatory evidence, Ambrose was acquitted at trial, but only after having served over two years in pretrial detention.

274.    During all relevant times, it was the established procedure and practice of the NYPD for detectives to ask eyewitnesses, after they had viewed of lineups, to review and sign "Line-Up Report" forms in which the lineup participants were listed and the police suspect was identified as the "suspect" or "subject."

275.    This practice caused eyewitnesses—such as Ernest Brown in the present case and the witnesses discussed in the cases below—to learn that the person they had selected in the lineup was the police suspect and therefore to become more certain and later to testify much more strongly about their identifications at hearings or trials.

276.    In 1994, NYPD detectives investigating a murder in Queens put Jaythan Kendrick in a lineup and showed the lineup to 10-year-old witness Brandon Rogers.

277.    Rogers selected a filler, number six.

278.    Detectives had Rogers review and sign a Line-Up Report that identified number three, Kendrick, as the police "Subject."

279.    Detectives then took Rogers and Rogers's mother into a private room, where Rogers heard a detective say that Rogers had selected the wrong person.

280.    Rogers, having learned that number three, Kendrick, was the police suspect, now told the detectives that number three was his "second choice."

40

281.    Rogers testified to this manufactured identification of Kendrick at trial, and Kendrick was convicted and spent almost 25 years in prison before forensic evidence that exculpated Kendrick came to light and his conviction was vacated and the indictment dismissed.

282.    The NYPD was still following the highly suggestive practice of allowing witnesses to learn the police suspect's identity by reviewing Line-Up Sheets as late as 2005.

283.    That year, Detective Robert Moscoso presented a lineup containing Julio Negron to an eyewitness to a Queens shooting.

284.    The eyewitness made an equivocal statement about whether he recognized Negron as the shooter.

285.    Moscoso then manufactured the witness's positive identification of Negron by showing the witness a Line-Up Report that identified Negron, in capital letters, as the police "SUSPECT," and taking the witness into a private room and speaking to him for at least 15 minutes. Negron spent nearly 10 years in prison before the New York Court of Appeals reversed his conviction.

286.    In 2009, Ricardo Benitez, a parolee, was arrested on suspicion of robbing a Radio Shack store in Queens.

287.    NYPD officers Raul Lopez and Frank Libretto deliberately prepared a highly suggestive lineup to ensure that Benitez was identified: Benitez appeared to be 15 to 20 years older than the fillers in the lineup, had much darker skin, was noticeably thinner, and was sickly-looking, unshaven, and disheveled, whereas the fillers all were hale and clean-cut police officers.

288.    A Queens ADA, Tina Grillo, who was present to supervise the lineup, told Detectives Lopez and Libretto that the lineup was improperly suggestive but then acquiesced in the procedure when they refused to select new fillers.

41

289.    Based on the resulting identification, a grand jury, which was not informed of the suggestiveness of the lineup, indicted Benitez.

290.    Benitez was convicted and spent almost six years in prison before his conviction was reversed and he was acquitted on retrial.

291.    Until 2010, the NYPD had no policy, practice, or procedure to learn about and investigate the considerable number of yearly lawsuits alleging police misconduct, settlements of such lawsuits, or judicial findings of improper or illegal police behavior.

292.    This was even though, since 1992, the NYPD had been admonished by two different New York City Comptrollers, as well as the Bar Association of the City of New York, to impose discipline on officers involved in settled civil cases in which constitutional violations were alleged, and to institute new training and/or other remedial action in response to such claims.

293.    In a 1992 report, then-Comptroller Elizabeth Holtzman recommended that the NYPD "monitor claims and lawsuits involving charges of police misconduct in addition to complaints filed with the Civilian Complaint Review Board and correlate the data from all three sources," and to "use the data from claims and lawsuits, as well as civilian complaints, to identify and correct problems in training or other procedures and policies; and identify individual police officers and take appropriate follow-up action, including additional training or other assistance" in order to "improve the functioning of the NYPD."

294.    In a 1999 report, then-Comptroller Alan Hevesi recommended that the City "[r]eview settled claims data," and re-train and discipline officers accordingly.

295.    In a 2000 report, the Association of the Bar of the City of New York concluded that the City's "policy" of failing to re-train or discipline officers involved in settled civil rights

lawsuits "has resulted in a situation in which the City consistently misses opportunities to increase the protection of the rights of persons in the City."

296.    The NYPD took no official action in response to any of these reports and recommendations.

297.    In a report issued in 2010, then-Comptroller John Liu reported that in the 2009-2010 fiscal year, the City had, for the first time, paid out more money for lawsuits against the NYPD than against any other City agency. He again recommended that the NYPD monitor incidents and practices that would give rise to claims.

298.    In the following civil rights lawsuits, the City paid substantial monetary settlements to plaintiffs for their claims that NYPD officers manufactured evidence, gave false testimony or statements, initiated prosecutions without probable cause, or otherwise violated the constitutional rights of the accused:

a.    *Gallo v. City of New York, et al.*, 95-cv-2105 (E.D.N.Y.) (settled 7/5/94, $13,334). Plaintiff arrested for robbery without probable cause; charges subsequently dismissed.

b.    *Gallion v. City of New York, et al.*, 93-cv-5180 (S.D.N.Y.) (settled 7/18/94, $25,000). Plaintiff arrested without probable cause; charges were dismissed.

c.    *Nakajima, et al. v. City of New York, et al.*, 94-cv-857 (E.D.N.Y.) (settled 3/8/95, $51,000). Two plaintiffs arrested without probable cause, while driving in rental car, despite providing a valid rental agreement.

d.    *Tong v. City of New York, et al.*, 95-cv-7965 (S.D.N.Y.) (settled 10/4/95, $35,000). Plaintiff arrested and strip searched for traffic violation, which was later dismissed.

e.    *Lopez, et al., v. City of New York, et al.*, 93-cv-6516 (S.D.N.Y.) (settled 1/2/96, $80,000). Two plaintiffs were arrested without probable cause and unlawfully strip searched; district attorney declined to prosecute.

f.    *Dabbah v. City of New York, et al.*, 95-cv-2952 (S.D.N.Y.) (settled 3/12/96, $35,000). Plaintiff arrested without probable cause; charges dismissed on People's motion eight months after arrest.

g.    *Nieves v. City of New York, et al.*, 94-cv-1491 (E.D.N.Y.) (settled 4/25/96, $50,000). Plaintiff, a security officer with the City's Department of Business Services with a Special Patrolman's license, was arrested without probable cause in baseless drug sweep, but never arraigned. Due to the incident, Plaintiff's employer revoked his license. An officer concocted a false story preventing Plaintiff from defending himself at a hearing pertaining to the revocation of his license.

h.    *Espinal v. City of New York, et al.*, 95-cv-9759 (S.D.N.Y.) (settled 6/7/96, $800,000). Plaintiff arrested without probable cause; police falsely testified before the grand jury; after plaintiff's guilty plea, conviction was vacated and the indictment was dismissed as procured by false and/or perjured testimony.

i.    *Victor v. City of New York, et al.*, 96-cv-243 (S.D.N.Y.) (settled 6/17/96, $725,000). Plaintiff arrested without probable cause; police falsely charged plaintiff and committed perjury in the grand jury; plaintiff's conviction was vacated and indictment dismissed.

j.    *Boland v. City of New York, et al.*, 93-cv-5058 (E.D.N.Y.) (settled 8/6/96, $30,000). Plaintiff arrested without probable cause; held in custody for two nights.

k.    *Taousse v. City of New York, et al.*, 95-cv-7965 (S.D.N.Y.) (settled 12/4/96, $16,000). Plaintiff arrested without probable cause and falsely charged with violating traffic laws; charges were dismissed.

l.    *Kadlub v. City of New York, et al.*, 95-cv-1080 (E.D.N.Y.) (settled 12/11/96, $34,000). Plaintiff arrested without probable cause on drug possession and sale charges.

m.    *Castro v. City of New York, et al.*, 94-cv-5114 (S.D.N.Y.) (settled 1/14/97, $72,500). Plaintiff arrested on weapons possession charges without probable cause; charges dropped after plaintiff was held in custody for several hours. Complaint alleged that NYPD officer responded to plaintiff's complaints about wrongful arrest by saying that he would not release her, but if the arrest were in error she could "always sue the City, [because] they got a lot of money."

n.    *Carthens v. City of New York, et al.*, 94-cv-8764 (S.D.N.Y.) (settled 3/18/97, $200,000). Plaintiff arrested without probable cause; police fabricated that plaintiff had dropped a bag that contained cocaine and a weapon; police swore to a Criminal Court complaint with false allegations.

o.    *Rojas v. City of New York, et al.*, 96-cv-8728 (S.D.N.Y.) (settled 3/31/97, $800,000). Plaintiff arrested without probable cause; police falsely charged plaintiff and testified falsely in the grand jury; plaintiff's conviction was vacated and indictment dismissed.

p.      *Frantino v. City of New York, et al.*, 96-cv-3725 (S.D.N.Y.) (settled 4/15/97, $50,000). Two plaintiffs arrested without probable cause and issued Desk Appearance Tickets; district attorney declined prosecution; parking summons issued by police dismissed for facial insufficiency.

q.      *McCaskill v. City of New York, et al.*, 96-cv-3687 (E.D.N.Y.) (settled 7/10/97, $100,000). Plaintiff arrested for disorderly conduct without probable cause.

r.      *Gurley v. City of New York, et al.*, 95-cv-2422 (E.D.N.Y.) (settled 8/21/97, $1,750,000). Conviction obtained in 1972 was vacated more than 20 years later based on prosecutor's withholding of exculpatory evidence, including an NYPD ballistics report. Complaint contained a malicious prosecution claim.

s.      *Sierzputowski, et al. v. City of New York, et al.* (E.D.N.Y.) (settled 12/1/97, $55,000). Two plaintiffs arrested without probable cause while driving a rental car, despite producing proof of valid rental; plaintiffs in custody for 41 hours until arrests voided.

t.      *Howlen v. City of New York, et al.*, 97-cv-6544 (S.D.N.Y.) (settled 12/22/97, $200,000). Plaintiff arrested without probable cause; police swore to false complaint; police testified falsely during preliminary hearing and in the grand jury; police admitted to committing perjury in connection with plaintiff's case.

u.      *Tomback v. City of New York, et al.*, 96-cv-3972 (E.D.N.Y.) (settled 2/9/98, $20,000). Plaintiff arrested without probable cause; charges dismissed due to lack of evidence.

v.      *Gaylock, et al. v. City of New York, et al.*, 96-cv-6183 (E.D.N.Y.) (settled 3/6/98, $90,000). Plaintiffs arrested without probable cause on weapons charges, which were pending for 10 months before dismissal by court.

w.      *Sharp v. City of New York, et al.*, 97-cv-4236 (S.D.N.Y.) (settled 3/17/98, $55,000). Plaintiff arrested and strip-searched without probable cause; falsely charged; charges were subsequently dismissed.

x.      *Paster v. City of New York, et al.*, 95-cv-10316 (S.D.N.Y.) (settled 3/23/98, $115,000). Plaintiff arrested without probable cause; charges against him were dismissed.

y.      *Gager v. City of New York, et al.*, 97-cv-4718 (S.D.N.Y.) (settled 6/1/98, $105,000). Plaintiff issued false summonses for criminal trespass and disorderly conduct; charges dismissed on People's motion.

z.      *Marino v. City of New York, et al.*, 97-cv-9003 (S.D.N.Y.) (settled 6/4/98, $90,000). Plaintiff arrested and strip-searched without probable cause; released when district attorney declined to prosecute case.

aa.    *Bradley v. City of New York, et al.*, 97-cv-4076 (E.D.N.Y.) (settled 10/14/98, $20,000). Plaintiff ordered to pull car over without probable cause; falsely arrested based on outstanding Illinois warrant issued for a different person; and held in custody for three days despite evidence that she was not the person being sought by the warrant.

bb.    *Gordon v. City of New York, et al.*, 97-cv-8035 (S.D.N.Y.) (settled 11/12/98, $40,000). Plaintiff arrested without probable cause based on false allegations in felony complaint made by NYPD officers; charges dismissed by prosecutor three months after arrest.

cc.    *Perez v. City of New York, et al.*, 98-cv-2331 (S.D.N.Y.) (settled 1/16/99, $15,000). Plaintiff arrested without probable cause; charges dismissed by court approximately one month after arrest.

dd.    *Williams v. City of New York, et al.*, 98-cv-5917 (S.D.N.Y.) (settled 2/1/99, $300,000). Plaintiff arrested without probable cause for possessing controlled substance; police falsified evidence to effect unlawful arrest of plaintiff.

ee.    *Silver v. City of New York et al.*, 97-cv-5384 (E.D.N.Y.) (settled 3/2/99, $40,000). Plaintiff arrested without probable cause; charges were dropped approximately four months later.

ff.    *Ziehenni v. City of New York, et al.*, 98-cv-3763 (S.D.N.Y.) (settled 3/5/99, $55,000). Plaintiff arrested without probable cause; charges pending for 2 ½ months before they were dismissed by the court. Complaint alleged arrest was made in retaliation for plaintiff's prior CCRB complaint.

gg.    *Deluise v. City of New York, et al.*, 98-cv-4535 (S.D.N.Y.) (settled 3/18/99, $28,000). Plaintiff arrested without probable cause.

hh.    *Napoli v. City of New York, et al.*, 97-cv-1255 (E.D.N.Y.) (settled 4/9/99, $60,000). Plaintiff arrested and indicted on weapons possession and assault charges based on false testimony by NYPD officers in grand jury. Plaintiff acquitted approximately one year after arrest.

ii.    *Martinez v. City of New York, et al.*, 96-cv-289 (E.D.N.Y.) (settled 4/12/99, $50,000). Plaintiff assaulted and arrested without probable cause when police entered her apartment with a battering ram looking for her son.

jj.    *Jefferson v. City of New York, et al.*, 98-cv-1097 (E.D.N.Y.) (settled 4/14/99, $175,000). Plaintiff, a corrections officer, arrested on drug charges without probable cause; charges pending for 5 months before grand jury returned no true bill. Complaint alleged that NYPD officers failed to inform prosecutors of their knowledge of plaintiff's innocence during the prosecution.

kk.   *Dennis v. City of New York, et al.*, 98-cv-5355 (E.D.N.Y.) (settled 5/26/99, $15,000). Plaintiff threatened, assaulted, and arrested without probable cause; false charges filed against plaintiff.

ll.   *Denizard v. City of New York, et al.*, 98-cv-423 (E.D.N.Y.) (settled 6/4/99, $64,000). Plaintiff arrested without probable cause for disorderly conduct, resisting arrest. Charges dismissed on People's motion eight months after arrest.

mm.   *Sweazie v. City of New York, et al.*, 99-cv-419 (E.D.N.Y.) (settled 10/20/99, $20,000). Plaintiff arrested on weapons possession charges; prosecution continued based on NYPD officers' false statements in felony complaint. Charges dismissed when grand jury voted no true bill.

nn.   *Davis v. City of New York, et al.*, 00-cv-387 (S.D.N.Y.) (settled 1/19/00, $175,000). Plaintiff arrested without probable cause; spent four months in jail before jury acquittal; during criminal trial, trial court found that plaintiff's arrest was "illegal and outrageous," that he was arrested solely because of his race, and that police took plaintiff's photo and showed it to the complainant unlawfully and without probable cause.

oo.   *Daniels v. City of New York, et al.*, 00-cv-1981 (S.D.N.Y.) (settled 3/15/00, $28,500). Plaintiff arrested without probable cause on weapons charges; charges dismissed by the court eight months after arrest.

pp.   *Mahase v. City of New York, et al.*, 96-cv-6105 (E.D.N.Y.) (settled 6/16/00, $75,000). Plaintiff arrested and detained without probable cause; charges dismissed on district attorney's motion due to lack of probable cause.

qq.   *Almonte v. City of New York, et al.*, 99-cv-519 (E.D.N.Y.) (settled 7/12/00, $30,000). Plaintiff arrested on drug sale charges without probable cause; indictment dismissed by the court one year, eight months after arrest.

rr.   *Fields v. City of New York, et al.*, 99-cv-8130 (E.D.N.Y.) (settled 7/28/00, $15,000). Plaintiff arrested without probable cause; prosecution continued for four months before dismissal by court.

ss.   *Lovell v. City of New York, et al.*, 00-cv-0002 (S.D.N.Y.) (settled 10/20/00, $40,000). Plaintiff arrested without probable cause for turnstile jumping based on false statements made by NYPD officer in criminal complaint.

tt.   *Golston v. City of New York, et al.*, 98-cv-4206 (E.D.N.Y.) (settled 10/26/00, $25,000). Plaintiff arrested on false charges of criminal harassment, which were dismissed after four months.

uu.   *Lindo v. City of New York, et al.*, 98-cv-9066 (S.D.N.Y.) (settled 11/21/00, $85,000). Plaintiff arrested without probable cause; police swore to false felony complaint; district attorney agreed to dismissal of charges.

vv.   *Cotto v. City of New York, et al.*, 00-cv-1341 (E.D.N.Y.) (settled 12/01/00, $30,000). Plaintiff arrested without probable cause; charges pending for one month before dismissal by the court.

ww.   *Coleman, et al. v. City of New York, et al.*, 00-cv-2019 (E.D.N.Y.) (settled 1/2/01, $60,000). Two plaintiffs arrested without probable cause; charges pending for 2 ½ months before dismissal. Complaint alleged that NYPD had policy, custom, and/or practice of arresting individuals without probable cause in lower income areas and areas with high reports of crime, which resulted in plaintiffs' false arrest and malicious prosecution.

xx.   *Udofia v. City of New York, et al.*, 00-cv-4872 (E.D.N.Y.) (settled 1/4/01, $30,000). Plaintiff arrested and detained without probable cause; was not prosecuted.

yy.   *Crespo v. City of New York, et al.*, 93-cv-8847 (S.D.N.Y.) (settled 8/29/06, $25,000). Plaintiff arrested without probable cause on weapons possession charges. Complaint alleged *Monell* claim based on the NYPD's "fostering [of] a policy to which perjury and the falsification of documents were methods of securing indictments and convictions of innocent individuals."

299.   Despite the City paying out the above settlements, the NYPD did not discipline any of these officers.

300.   Most of the above settlements were reached—and NYPD policymakers thus put on notice of the need to discipline the officers in question—before Plaintiff's prosecution and conviction.

301.   Evidence from more recent years shows that the NYPD's deliberate indifference to constitutional violations by police officers persists.[1]

302.   In 2014, a court dismissed attempted murder charges against Tyrone Brown after an eyewitness who had viewed a lineup revealed that she had first picked out a filler, but then, after one of the NYPD detectives conducting the lineup sighed and told her to take her time,

---

[1] Post-incident evidence is relevant to a claim of municipal liability as it may "shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right." *Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989); *see also Henry v. Cty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997) ("[W]e reiterate our rule that post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry.").

changed her answer and picked the defendant, which elicited a nod from the two detectives in the room.

303.    The witness revealed that, in fact, she still believed that the original person she picked was the shooter.

304.    The problem of "testilying" documented by the Mollen Commission Report has also been permitted, during the ensuing years, to continue to fester.

305.    The *New York Times* reported that there were "more than 25 occasions since January 2015" in which "judges or prosecutors determined that a key aspect of a New York City police officer's testimony was probably untrue."[2] The article noted that these cases represented "almost certainly only a fraction" of the actual instances of testilying, since "a vast majority of cases end in plea deals before an officer is ever required to take the witness stand."

306.    In a follow-up article, the *Times* reported that, out of 81 cases in which the Civilian Complaint Review Board ("CCRB") had found that an NYPD officer had made a false statement and the NYPD had reported some response to the finding, NYPD policymaking officials had disciplined officers in only two of the cases.[3]

307.    The CCRB told the reporter that, in addition to these 81 cases, the CCRB had made findings of false statements in "dozens of other" cases, but the NYPD never even responded to these findings.

---

[2] Joseph Goldstein, *'Testilying' by Police: A Stubborn Problem*, N.Y. Times, Mar. 18, 2018, https://www.nytimes.com/2018/03/18/nyregion/testilying-police-perjury-new-york.html.

[3] *See* Joseph Goldstein, *Promotions, Not Punishments, for Officers Accused of Lying*, N.Y. Times, Mar. 19, 2018, https://www.nytimes.com/2018/03/19/nyregion/new-york-police-perjury-promotions.html.

308.    In 2018, *BuzzFeed* reported that it had obtained NYPD files revealing that "from 2011 to 2015 at least 319 New York Police Department employees who committed offenses serious enough to merit firing were allowed to keep their jobs."[4]

309.    At least 50 of these instances of misconduct involved officers making misleading or "inaccurate" statements in official records or to grand juries, district attorneys, or internal affairs investigators.

310.    In every instance, NYPD policymaking officials who had "final authority in disciplinary decisions, assigned these officers to "dismissal probation," a penalty with few practical consequences."

311.    Based on the above, NYPD policymaking officials knew or should have known, at the time of Plaintiff's prosecution, that NYPD employees, including the Individual Defendants, were, among other things, manufacturing false or unreliable identification evidence, witness statements, or other evidence; initiating or continuing the prosecutions of criminal suspects despite lacking legitimate probable cause to believe such prosecutions would result in convictions; withholding or destroying material exculpatory or impeaching evidence under *Brady* and *Giglio*; and knowingly giving false or misleading testimony.

312.    With deliberate indifference to such misconduct, NYPD policymaking officials failed to take adequate steps to train, supervise, or discipline NYPD employees to prevent or deter such constitutional violations from occurring.

---

[4] Kendall Taggart & Mike Hayes, *Secret NYPD Files: Officers Who Lie And Brutally Beat People Can Keep Their Jobs*, BuzzFeed, Mar. 5, 2018, https://www.buzzfeednews.com/article/kendalltaggart/secret-nypd-files-hundreds-of-officers-committed-serious.

313.    This policy of deliberate indifference directly, foreseeably, proximately, and substantially caused the violations of Plaintiff's federal constitutional rights in this case and his resulting injuries.

314.    By virtue of the foregoing, Defendant City of New York is liable for the violation of Plaintiff's constitutional rights pursuant to 42 U.S.C. § 1983 and Plaintiff's resultant injuries.

## NINTH CAUSE OF ACTION

**42 U.S.C. § 1983 and *Monell*. Municipal liability for the deliberate indifference of policymaking officials at the Kings County District Attorney's Office to the misconduct of prosecutors. Defendant City of New York.**

315.    Plaintiff repeats and realleges each allegation contained in ¶¶ 1-130 as if fully set forth herein.

316.    At the time of Plaintiff's criminal prosecution, he was entitled to timely disclosure by the KCDAO of all material information in the possession, custody, or control of the KCDAO that was favorable to the defense with respect to guilt or innocence and the credibility of prosecution witnesses.

317.    Nevertheless, the KCDAO either completely concealed several pieces of such information or disclosed such information too late for the defense to make effective use of it.

318.    Such information included, but was not limited to, the following:

a.    detectives had prepared at least two photo arrays containing suspects who matched Ernest Brown's description of the bumper-passenger more closely than Perkins did;

b.    before trial, Ernest Brown had agreed to testify—contrary to his pretrial statements to police that the gold Q45 registered to Maurice Mayo *resembled* the car used by the perpetrators—that this gold Q45 was *the* car used by the perpetrators; and

       c.     before trial, Ernest Brown had agreed to testify, contrary to his sworn pretrial statements, that he had not seen where the bumper-passenger came from before bumping Reuben Scrubb.

319.    Additional, substantial causes of Plaintiff's conviction were (a) ADA De Ingeniis's misconduct in causing Brown to give—or in knowingly failing to correct—Brown's false testimony that he recognized Maurice Mayo's gold Q45 as the perpetrator's car and that he had not seen where the bumper-passenger had come from, and (b) ADA De Ingeniis's misconduct during his summation. *See* ¶¶ 113-123.

320.    Individually and collectively, the KCDAO's withholding of the above information and the other misconduct by ADA De Ingeniis deprived Plaintiff of his constitutional rights to due process and a fair trial and to be free from unreasonable seizure and were a substantial cause of Plaintiff's constitutional injuries.

321.    These violations of Plaintiff's constitutional rights, among others, wholly or substantially resulted from the unlawful policies, customs, and practices of the KCDAO, for which the District Attorney, as chief policymaker for the DA's Office, was responsible.

322.    Under the principles of municipal liability for federal civil rights violations, the DA or his authorized delegates have final managerial responsibility for training, instructing, supervising, and disciplining attorneys and other employees of the DA's Office with respect to the investigation and prosecution of criminal matters.

323.    The particular areas in which the DA or his authorized delegates were responsible for training, instructing, supervising, and disciplining attorneys and other employees of the DA's Office included but were not limited to:

       a.     their continuing constitutional obligation to timely and fully disclose material evidence and information favorable to the defense as set forth in *Brady*, *Giglio*, and their progeny;

b.    the constitutional prohibition on introducing, or knowingly failing to correct, false or misleading testimony by prosecution witnesses; and

c.    their constitutional obligation to give summations that comply with fundamental rules governing the conduct of a fair trial.

324.    The DA or his authorized delegates maintained a policy, custom, or practice of deliberate indifference to past violations by KCDAO employees of these constitutional obligations, to the risk of future such violations by KCDAO employees, and to the obvious need to train, supervise, and discipline KCDAO employees with respect to these obligations.

325.    The aforesaid deliberate or de facto policies, procedures, regulations, practices, and/or customs, including the failure to properly instruct, train, supervise, and/or discipline employees with regard thereto, were implemented or tolerated by policymaking officials for Defendant City, including, but not limited to, the DA and his delegates, who knew:

a.    to a moral certainty that such policies, procedures, regulations, practices, and/or customs concerned issues that regularly arose in the investigation and prosecution of criminal cases;

b.    that such issues presented employees with difficult choices of the sort that instruction, training, supervision, and discipline would make less difficult;

c.    that employees facing such issues had strong incentives to make the wrong choices, especially given the pressure the DA's Office placed on prosecutors to win convictions at any cost;

d.    that the wrong choice by municipal employees concerning such issues would frequently cause the deprivation of the constitutional rights of the accused and caused them constitutional injury; and

e.    that employees of the DA's Office had a history of making wrong choices in such matters.

326.    The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph based upon:

a.    numerous credible allegations, many substantiated by judicial decisions (as discussed further below), that KCDAO prosecutors had:

i.    failed to disclose information favorable to the defense that was required to be disclosed by the constitutions and the laws of the United States and of the State of New York;

ii.    introduced, or knowingly failed to correct, testimony or other evidence that was false or misleading; and

iii.    made arguments at trial that were so false, misleading, or otherwise improper that they deprived the defendant of due process and a fair trial; and

b.    the inherent obviousness of the need to train, supervise, and/or discipline ADAs in the aforementioned constitutional obligations to counteract the pressure that the DA's Office applied to prosecutors to obtain convictions.

327.    Charles J. Hynes was the Kings County District Attorney from 1990 to 2013.

328.    Hynes's managerial and personnel policies were aimed at encouraging prosecutors to win convictions at any cost, including by suppressing exculpatory evidence in violation of *Brady*, using false testimony, and committing summation misconduct.

329.    Hynes's training, policies, customs, and practices in response to allegations of prosecutorial misconduct communicated to his staff that so long as they won convictions, he would support them, regardless of the means they employed to secure those convictions.

330.    The existence of such training, policies, customs, and practices during Hynes's tenure as DA is established by, *inter alia*, the sworn admissions of former KCDAO prosecutors, KCDAO internal records, and/or admissions by Hynes himself during his December 13, 2013, videotaped deposition in the Jabbar Collins case.

331.    Hynes and his top lieutenants—his counsel, Dino Amoroso; his Chief of investigations and former Chief of the Homicide Bureau Michael Vecchione; his Chief Assistant, Amy Feinstein; and numerous other ADAs and supervisors—admitted in sworn depositions in *Collins v. City of New York*, No. 11 CV 766 (FB) (RML) (E.D.N.Y.); *Zahrey v. City of New York*, No. 98 Civ. 4546 (S.D.N.Y.); and other cases that Hynes had no written *Brady* policy, no formal

rules of behavior governing how cases would be prosecuted and when (if ever) discipline for misconduct would be warranted, and no formal disciplinary system for investigating or disciplining prosecutors who violated the rights of criminal defendants.

332.    While Hynes maintained an employee manual governing relatively minor issues such as the use of office equipment and time sheets, and penalties for violating those policies, there were no written standards by which prosecutors' conduct during the course of criminal cases would be assessed for discipline, much less any possible penalty that could be imposed.

333.    The KCDAO representatives above testified that the office's informal disciplinary "procedure" was for Hynes himself to review all criticisms or complaints about prosecutors.

334.    These representatives testified, under oath, that while dozens of court decisions documenting the misconduct of KCDAO prosecutors were brought to Hynes's attention, Hynes failed to report the offenders to outside attorney disciplinary bodies.

335.    Exhibit A is a list of 78 cases during Hynes's tenure—55 of them decided in or before 2001, when Plaintiff's trial occurred—in which courts found KCDAO prosecutors to have committed errors or misconduct related to their *Brady* obligations, their use of or failure to correct false testimony, or their summations.

336.    The KCDAO representatives mentioned above testified that *Hynes did not in a single one of these instances direct that any internal disciplinary investigation be conducted*, let alone that any discipline be imposed.

337.    The KCDAO personnel files of the prosecutors involved in the cases listed in Exhibit A reveal no documentary evidence of disciplinary action ever being taken against the prosecutors and no notations of their misconduct, and Hynes conceded during his deposition

testimony in the Jabbar Collins case that he took no remedial action with respect to such misconduct.

338.    Indeed, Hynes did not once in his 24 years in office ever terminate, suspend, demote, transfer, or otherwise discipline any prosecutor for such misconduct.

339.    Instead, KCDAO personnel records establish that Hynes and his managerial staff almost invariably gave good evaluations, recommendations, promotions, and pay raises to prosecutors they knew had been alleged or found to have engaged in such misconduct, recommended some of them for judgeships and others for awards, and otherwise ratified the misconduct by aggressively defending it even after it was exposed.

340.    When Hynes received letters from the public or public officials praising his prosecutors, Hynes personally wrote to the prosecutors informing them that he had received the complimentary report, and praised the prosecutors. In contrast, when prosecutors' conduct in their handling of a criminal case was criticized, Hynes ignored it, never investigated it, and never confronted the prosecutor about the alleged behavior.

341.    Likewise, while Hynes's complimentary letters were included in the prosecutors' personnel files, no notation was made about any of the complaints or evidence of the prosecutors' wrongdoing.

342.    When a court explicitly found that a prosecutor committed misconduct, no record of the finding was kept in the prosecutor's personnel file or in a central file, making it virtually impossible to track repeat offenders or to take a prosecutor's behavior into account before promoting the prosecutor to bureaus where the consequences of such misconduct were at their highest.

343.    Many prosecutors whom courts found to have committed misconduct were placed in supervisory and training positions over new ADAs, essentially ensuring that improper practices would be repeated.

344.    While failing to implement any disciplinary infrastructure for prosecutorial misconduct, Hynes *did* keep win/loss statistics, making a prosecutor's conviction rate a key factor in his or her ability to advance their careers within the office.

345.    A number of cases handled by Hynes's office in the years preceding Plaintiff's arrest and prosecution illustrate Hynes's unlawful policies and practices in action.

346.    Shortly after Hynes assumed office in 1990, he defended the wrongful conviction secured by the administration of a prior District Attorney in the infamous Waldbaum's Supermarket Fire case in which six New York City firefighters died. Prosecutors had convicted a man named Eric Jackson of a purported arson that killed the firefighters and convinced the court to sentence Jackson to 25 years to life.

347.    However, the trial court vacated the conviction on the basis of new evidence that the homicide prosecutor, Jon Besunder, had concealed *Brady* material from Jackson indicating that a fire expert had deemed the fire accidental, that the Fire Department likely fabricated the arson to ensure the firefighters' families received greater death benefits, and that there was evidence that undercut Jackson's confession.

348.    In June 1990, the Appellate Division affirmed the trial court's decision.

349.    Instead of disciplining Besunder for these extraordinary *Brady* violations, Hynes promoted Besunder to First Deputy Chief of the KCDAO Homicide Bureau, just a month after the Appellate Division's affirmance.

350.    At a subsequent evidentiary hearing in the Jackson case, the trial court found that Besunder's testimony at the hearing was "evasive and disingenuous." *People v. Jackson*, 154 Misc.2d 718, 722 (Sup. Ct. Kings Cty. June 12, 1992).

351.    Yet, as Besunder later testified at a deposition in the Jabbar Collins case, neither Hynes nor anyone else from the KCDAO ever questioned him about the Jackson case, or even brought up his conduct in the case before or after promoting him.

352.    Instead, Besunder continued in his supervisory position and was later promoted to Executive District Attorney, training younger ADAs on the Riding Program and instructing them to, among other things, avoid creating a record of evidence that a defendant could use to challenge his case.

353.    In the 1993 Ruddy Quezada case, Quezada was convicted based on the testimony of star witness Sixto Salcedo. During trial, the prosecutor portrayed Salcedo as a voluntary witness with no reason to lie. Years later, however, Salcedo recanted his trial testimony, explaining that he had been arrested on a material witness warrant and held against his will at a hotel by the KCDAO.

354.    A high-level appellate prosecutor scoffed at Quezada's claims, arguing they were untrue, there was absolutely no evidence to support them, and there was "no copy of a material witness order in the file." The trial prosecutor, who was by then a supervisor in the KCDAO, denied any knowledge of the material witness warrant as well.

355.    Years later, when a federal habeas court ordered discovery, the KCDAO produced the supposedly non-existent material witness warrant and hotel custody records confirming Salcedo's account. The material witness warrant had been obtained by the very trial prosecutor who had sworn under oath that he had no knowledge of it.

58

356.    The case was remanded to state court, and Hynes took the position that the KCDAO's suppression and misrepresentations regarding the material witness warrant and hotel custody did not constitute *Brady* violations or entitle Quezada to any relief.

357.    During discovery in state court, the KCDAO turned over an email establishing that the appellate prosecutor who had claimed there was no material witness warrant in the file, like the trial prosecutor, had personal knowledge of the warrant long before she made her false representations.

358.    Yet Hynes neither investigated nor disciplined the trial or appellate prosecutors, or acknowledged that their conduct violated Quezada's right to due process. Instead, he continued to defend their conduct and the conviction secured through their suppression.

359.    It was not until Hynes's successor, Kenneth Thompson, came into office that the KCDAO finally fired the appellate prosecutor and consented to vacatur and dismissal of all charges against Quezada.

360.    Hynes's acquiescence to such misconduct as a matter of policy is also demonstrated by his failure to sanction outrageous misconduct by then–Deputy Bureau Chief Mark Hale during the 1998 trial of Vladimir Campos, a potential death penalty case.

361.    During Hale's direct examination of a key witness, the witness blurted out that detectives had coerced him into making a statement incriminating Campos, and that prior to trial he had recanted his statement when meeting with Hale and subsequently failed a lie detector test.

362.    The defense objected that Hale had failed to disclose any of this information and moved for a mistrial.

363.    Hale responded by arguing, incorrectly, that the witness's pretrial recantation was not *Brady* material because it was not credible.

364.    When the Court asked Hale whether he "had any knowledge of the purported lie detector test," Hale falsely told the Court: "No, Judge. I don't recall. I don't have anything in my file about that. The Court knows that I wasn't on this case right from the get-go. I'm not seeing anything in my files that purports to do that."

365.    But during a hearing on the *Brady* issue two days later, the DA's Office revealed that, in truth, *Hale himself had requested the lie detector test* and had personally prepared the questions.

366.    It was also revealed that Hale had affirmatively misstated to the defense that the witness never recanted his story.

367.    The trial judge found that the pretrial recantation and polygraph test constituted *Brady* material, that Hale was "absolutely without justification" in failing to disclose it, and that Hale's false representations to the court were "prosecutorial misconduct." As a sanction, the judge struck the testimony of the witness in its entirety and gave the jury a curative instruction.

368.    Despite this explicit judicial finding of Hale's misconduct, neither Hynes nor anyone else in the KCDAO investigated, sanctioned, disciplined, or penalized Hale. Instead, Hale maintained his supervisory position in the DA's Office, and continued to receive promotions, including a promotion to Chief Counsel to Hynes.

369.    The court's finding of misconduct was not placed in Hale's personnel file, preventing any successor DA from learning of Hale's misconduct. As a result, when DA Thompson came into office, he promoted Hale to head a newly-constituted Conviction Review Unit.

370.    Perhaps the most egregious and revealing example of Hynes's policy and practice of defending prosecutors no matter how egregious and undeniable their misconduct is the case of Jabbar Collins.

371.    Collins was arrested in 1994 and prosecuted in 1995.

372.    In 2006, Collins brought a post-conviction motion documenting, among other misconduct, *Brady* violations, witness coercion, and the knowing presentation of false evidence and argument by prosecutor Michael Vecchione, Hynes's longtime close confidante who was then chief of the KCDAO's Homicide Bureau and later was Hynes's Chief of Investigations.

373.    Rather than investigate whether Collins's allegations were true, Hynes assigned several attorneys who were Vecchione's direct subordinates, and who were second seating him on several high-profile cases, to defend Vecchione's conduct no matter how egregious they found it to be.

374.    These prosecutors presented in court a false sworn affirmation by Vecchione denying the allegations, which caused Collins's state-court post-conviction motion to be denied.

375.    However, proceedings in Collins's subsequent federal habeas corpus action forced the KCDAO to disclose extensive *Brady* material that the KCDAO had possessed all along but had withheld from Collins and his attorneys. The disclosure revealed that Vecchione's sworn affirmation, used to defeat Collins's state post-conviction motion, was perjured.

376.    Yet Hynes continued to support Vecchione, declared he had done nothing wrong, and held him out as exemplifying the qualities that served as an example to other prosecutors in the office. Ultimately, in granting Collins's habeas petition, dismissing the underlying state indictment, and releasing Collins from custody after 16 years of wrongful imprisonment, Judge

Irizarry condemned Hynes and the KCDAO for defending Vecchione's misconduct and for Hynes's failure to properly train, supervise, and discipline his staff.

377.    In the face of those egregious constitutional violations, Hynes had his prosecutors declare on the record during the proceeding before Judge Irizarry dismissing the case that the DA's Office "stands behind the conduct of" Vecchione and other prosecutors who had committed misconduct.

378.    Within a day of the dismissal, Hynes told the media that Vecchione was a "very principled lawyer" and "was not guilty of any misconduct," and that he would not conduct any investigation into Vecchione's conduct.

379.    Hynes summarily declared Vecchione would face no disciplinary action. Hynes thereafter promoted Vecchione and continued to praise him.

380.    In subsequent civil proceedings, a federal judge, the Honorable Frederic Block, excoriated Vecchione's conduct and Hynes's failure to investigate it. Yet even after Judge Block's condemnation, which was reported in virtually all major New York newspapers, Hynes did not even read Collins's civil complaint or post-conviction papers to review Vecchione's conduct.

381.    Hynes's own unethical and criminal conduct while in office, including his direct participation in *Brady* violations, in full view of his executive staff, speaks to his propensity to tolerate such conduct by his employees.

382.    Hynes had his counsel, Dino Amoroso, falsely notarize his wife's signature on a real estate document when she wasn't in the office and Amoroso didn't witness her signature. Amoroso exercised authority over the conduct of ADAs, yet he knew Hynes tolerated the criminal fabrication of false documents.

383.    In 2008, Samuel Kellner's 16-year-old son told him that Baruch Lebovits, a prominent Hasidic cantor, had molested the boy in a car. Kellner worked with a detective to obtain the cooperation of a witness who claimed also to have been molested by Lebovits. Lebovits was tried and convicted. Kellner was then arrested and charged with bribing the witness to claim that Lebovits had abused him. Unbeknownst to Kellner, Lebovits's attorney, attempting to secure leniency for Lebovits, had admitted to the DA's Office that Lebovits had abused the witness, which tended to contradict the allegation that Kellner had bribed the witness.

384.    In 2013, after Kellner's lawyers served a written *Brady* request, Hynes personally edited a response letter that concealed the existence of Lebovits's admissions. Hynes's undertook these actions in full view of his executive staff, and he then had two of these staff members present his misleading letter to Kellner's attorneys. It was not until Kellner brought a civil lawsuit three years later, after his criminal case was dismissed, that Kellner finally learned of the existence of the *Brady* material.

385.    Hynes also was found to have personally committed criminal conduct while District Attorney.

386.    Hynes and eight members of his executive staff admitted in detailed stipulations to the New York City Conflict of Interest Board that they violated § 2604 of the New York City Charter by using City resources, time, or equipment in their efforts to assist Hynes's 2013 re-election campaign by fending off public criticism of the KCDAO's wrongful convictions. Such violations constitute a Class A misdemeanor. *See R.A.C. Group v. Board of Educ. of City of New York*, 21 A.D.3d 243, 247-248 (2d Dep't 2005) ("A person who violates New York City Charter § 2604 is guilty of a misdemeanor, and forfeits his or her public office or employment upon

conviction[.]"); Penal Law § 55.10 (2)(b) (providing any misdemeanor defined outside of that statute without specification "shall be deemed a class A misdemeanor").

387.    Hynes was fined $40,000 (the highest fine in NYC history for such conduct), and fines also were imposed against Amy Feinstein, Chief Assistant District Attorney; Dino Amoroso, Deputy District Attorney; Henna White, Community Liaison to the Orthodox Jewish Community; Anne Swern, First Assistant District Attorney; Lance Ogiste, Counsel to Hynes; Michael F. Vecchione, Chief of the Rackets Division; Marc Fliedner, Executive District Attorney; and Mary Hughes, Confidential Assistant District Attorney.

388.    Yet even after Hynes and his executives admitted to committing these acts, Hynes publicly declared they "did nothing wrong."

389.    In June 2014 the FBI concluded "there is an articulable and factual basis HYNES engaged in criminal activity" by illegally using hundreds of thousands of dollars in civil forfeiture funds to pay a political consultant for work on his 2013 election campaign.

390.    Since Hynes's departure from the DA's Office, the DA's Office has explicitly found that unlawful policies and practices implemented by Hynes led to numerous wrongful convictions.

391.    In 2020, the DA's Office published a comprehensive report admitting that the use of false evidence and suppression of *Brady* material were institutional failures of the Hynes administration and had resulted in at least 25 wrongful convictions. See Kings County District Attorney's Office, *426 Years: An Examination of 25 Wrongful Convictions in Brooklyn, New York*, July 9, 2020, p. 14 ("Taken together, the wrongful convictions discussed here all point to failures of the prosecution as an institution—whether through acts of individual prosecutors, collective decisions, or failure to train or guide prosecutors adequately"); p. 60 ("In many of the

64

cases, prosecutors . . . failed to disclose important relevant evidence. And in a number of cases, prosecutors failed to adhere to expectations of candor and diligence, thereby denying the defendants a fair trial").

392.    At all relevant times, the DA and his authorized delegates had final authority with respect to the management of personnel employed by or assigned to the DA's Office and the administration of that office.

393.    These officials collectively constituted a City policymaker for whose actions or omissions the City is liable.

394.    Kings County is a subdivision of Defendant City of New York.

395.    The DA, at all relevant times, was and is an elected officer of Kings County, and the DA's Office was and is funded out of the City's budget.

396.    The DA was and is designated a "local officer," rather than a "state officer," under New York Public Officers Law § 2.

397.    The DA and his assistant district attorneys are agents and employees of Defendant City of New York.

398.    The State of New York has provided by statute that Defendant City's constituent counties (including Kings County), and hence Defendant City itself, are liable for torts committed by County officers and employees, such as the DA and his assistants. *See* N.Y. County Law §§ 53, 941.

399.    The City represents such officers and employees in judicial proceedings and indemnifies them because they are City officials.

400.    By virtue of the foregoing, Defendant City of New York is liable for the violation of Plaintiff's constitutional rights pursuant to 42 U.S.C. § 1983 and Plaintiff's resultant injuries.

## DEMAND FOR DAMAGES

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

a.    compensatory damages for loss of liberty, past and future mental and emotional distress, and economic harm of not less than $60,000,000;

b.    punitive damages of not less than $20,000,000;

c.    reasonable attorneys' fees, together with costs and disbursements, under 42 U.S.C. § 1988, NY.C. Admin. Code § 8-805, and the inherent powers of this Court;

d.    pre-judgment interest as allowed by law; and

e.    such other and further relief as this Court may deem just and proper.

/s/ Joel B. Rudin
_____
JOEL B. RUDIN
JACOB LOUP
Law Offices of Joel B. Rudin, P.C.
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
jbrudin@rudinlaw.com

*Attorneys for Plaintiff*

Dated:    New York, New York
          September 11, 2024

**EXHIBIT A**

**Judicial decisions finding that Brooklyn prosecutors
violated *Brady*, knowingly used false or misleading evidence,
or made improper summation arguments**

1.    *People v. Murphy*, 109 A.D.2d 895 (2d Dep't 1985) (prosecutor failed to timely disclose *Brady* material)

2.    *People v. Perez*, 65 N.Y.2d 154 (1985) (prosecutor committed *Rosario* violation by failing to disclose documentation indicating key witness accepted bribe)

3.    *People v. Gairy*, 116 A.D.2d 733 (2d Dep't 1986) (prosecutor failed to timely disclose *Brady* material)

4.    *People v. Ranghelle*, 69 N.Y.2d 56 (1988) (prosecution failed to obtain and disclose *Rosario* material; conviction reversed)

5.    *People v. Lugo*, 153 A.D.2d 761 (2d Dep't 1989) (prosecutor's suppression of *Rosario* material required reversal of conviction)

6.    *People v. Cortez*, 149 Misc.2d 886 (Sup. Ct. Kings Cty. 1990) (prosecution "shared responsibility" for police violation of *Brady* by violating court order and intentionally destroying tape containing impeachment material; indictment dismissed)

7.    *People v. Nedrick*, 166 A.D.2d 725 (2d Dep't 1990) (failure to disclose tape recorded impeachment material)

8.    *People v. Anderson*, 160 A.D.2d 806 (2d Dep't l990) (prosecutor failed to timely disclose impeachment material)

9.    *People v. Acevedo*, Ind. Nos. 9292/87 and 1373/87 (during defendant's 1990 trial, prosecutor suppressed that a cooperating witness had confirmed the defendant's duress defense that he had been forced to commit the crime)

10.   *People v. Hamilton*, Ind. No. 142/91 (Trial prosecutor falsely presented witness as appearing voluntarily, did not disclose that witness had been arrested in North Carolina, extradited to New York against her will, threatened by the trial judge at a secret proceeding with incarceration if she did not cooperate with the ADA, and then held in "hotel custody" by DA's detective-investigators. Several prosecutors then withheld all of these facts during defendant's post-verdict CPL § 330.30 hearing.)

11.   *People v. Ranta*, Ind. No. 8990/90, reported at 203 A.D.2d 307 (2d Dep't 1994) (myriad *Brady* violations and use of false or misleading evidence during defendant's 1991 trial. Appellate Division noted it did not "condone" the *Brady* and *Rosario* violations, but did not reach the merits on the ground of lack of preservation)

12.   *People v. Fleming*, 196 A.D.2d 551 (2d Dep't 1993) (during defendant's 1990 murder trial, prosecutor suppressed *Brady* material indicating defendant was in another state when the crime was committed. Exonerated in 2014 upon the motion of DA Ken Thompson.)

13.   *Lopez v. Miller*, 915 F. Supp. 2d 373, 431 (E.D.N.Y. 2013) (Garaufis, J.) (finding that the prosecutor, during defendant's 1990 murder trial, was "overzealous and deceitful" and falsely claimed prosecution witness had never been made aware of cooperation agreement)

14.   *People v. Brazzeal*, 172 A.D.2d 757 (2d Dep't 1991) (prosecutor gave an improper and prejudicial summation);

15.   *People v. Faison*, 176 A.D.2d 752 (2d Dep't 1991) (prosecutor belatedly disclosed witness's prior statement)

16.   *People v. Crespo*, 188 A.D.2d 483 (2d Dep't 1992) (mistrial granted due to prosecutor's *Brady* violation)

17.   *People v. Brown*, 187 A.D.2d 437 (2d Dep't 1992) (trial court sanctioned prosecutor for *Brady* violation)

18.   *People v. Young*, 155 Misc.2d 878 (Sup. Ct. Kings Cty. 1992) (failure to disclose impeachment material required new trial; hearing court condemned prosecution for tailoring testimony)

19.   *Walker v. City of New York*, 914 F.2d 293 (2d Cir. 1992) (court upheld *Monell* claim against City of New York for unlawful policies of KCDAO that allegedly resulted in withholding of *Brady* material causing plaintiff's wrongful conviction and 18- year imprisonment)

20.   *People v. Giddings*, 2/21/92 NYLJ 25 (col. l) (Sup. Ct, Kings Cty. Feb. 21, 1992) (prosecutor's failure to disclose witness's prior inconsistent statements required conviction to be vacated)

21.   *People v. Cecora*, 186 A.D.2d 215 (2d Dep't 1992) (failure to disclose ADA's interview notes with arresting officer containing potential impeachment)

22.   *People v. Hughes*, 181 A.D.2d 132 (2d Dep't 1992) (hearing required regarding failure to disclose exculpatory police report)

23.   *People v. Inswood*, 180 A.D.2d 649 (2d Dep't 1992) (ADA's failure to turn over *Brady* material was error)

24.   *People v. Wagstaffe*, 120 A.D.3d 1361 (2d Dep't 2014) (during 1992-1993 trial, prosecutor suppressed *Brady* material that contradicted detective's testimony at *Wade* hearing)

2

25.   *People v. Jackson*, 198 A.D.2d 301 (2d Dep't 1993), *affirming* 154 Misc.2d 718 (Sup. Ct., Kings Cty. 1992) (prosecutors failed to timely disclose exculpatory statements; conviction reversed)

26.   *People v. Stevens*, 199 A.D.2d 441 (2d Dep't 1993) (*Rosario* material "improperly" withheld as well as *Brady* material)

27.   *People v. Marshall*, Ind. Nos. 7578/92, 9490/92, 12592/92 (Homicide Bureau Chief Michael Vecchione suppresses his cooperation agreement with star prosecution witness, elicits witness's false testimony, and produces witness to KCDAO on *Damiani* order to negotiate deal with witness and circumvent the witness's lawyer)

28.   *People v. Khadaidi*, 201 A.D.2d 585 (2d Dep't 1994) (conviction reversed for prosecution's failure to disclose prosecutor's interview notes with complainant containing a prior inconsistent statement)

29.   *People v. Alvarado*, 201 A.D.2d 486 (2d Dep't 1994) (police reports containing impeachment material not disclosed, conviction reversed)

30.   *People v. Barnes*, 200 A.D.2d 751 (2d Dep't 1994) (prosecutor did not record and did not disclose eyewitness's recantation)

31.   *People v. Bramble*, 207 A.D.2d 407 (2d Dep't 1994) (sanctions upheld for prosecution's failure to preserve police audiotapes notwithstanding defense discovery request)

32.   *People v. Roberts*, 203 A.D.2d 600 (2d Dep't 1994) (prosecution delayed one year in disclosing exculpatory witness statement, by which time witness was unavailable;)

33.   *People v. Neptune*, 161 Misc.2d 781 (Sup. Ct. Kings Cty.1994) (KCDAO acted unethically by improperly using invalid subpoena to cause a witness to appear for an interview)

34.   *People v. Scott*, 216 A.D.2d 592 (2d Dep't 1995) (prosecution suppressed reports, including polygraph results indicating key witness was withholding information)

35.   *People v. Ramos*, 166 Misc.2d 515 (Sup. Ct. Kings Cty. 1995) (due to KCDAO policy of not taking of witness interviews, trial assistant not aware that previous assigned prosecutors interviewed complainant and possibly obtained information the court had required the People to disclose to the defense)

36.   *People v. Rahman*, 231 A.D.2d 745 (2d Dep't 1996) (matter remitted for hearing concerning prosecution's apparent improper withholding of witness's cooperation agreement)

37.   *People v. Perkins*, 221 A.D.2d 572 (2d Dep't 1996) (prosecutor failed to disclose cooperation agreement with witness)

38.   *People v. Scott*, 88 N.Y.2d 888 (1996) (prosecution failed to disclose statement regarding polygraph result)

39.   *People v. Callendar*, 227 A.D.2d 499 (2d Dep't 1996) (conviction reversed due to ADA's failure to turn over notes of detective's prior statement)

40.   *People v. Bruce*, 224 A.D.2d 438 (2d Dep't 1996) (conviction reversed for prosecutor's failure to produce police reports containing impeachment material)

41.   *People v. Dupont*, Indictment No. 6287/97 (ADA made misrepresentation during defendant's 1998 trial by claiming KCDAO did not possess physical evidence specifically requested by the defense)

42.   *People v. Logan* (convicted in 1997 after prosecutor introduced false evidence by "eyewitness" who was actually in jail at the time of the relevant events. Conviction vacated in 2014 by DA Ken Thompson's Conviction Integrity Unit.)

43.   *People v. LaSalle*, 243 A.D.2d 490 (2d Dep't 1997) (conviction reversed due to prosecutor's "blatant misrepresentation of the facts" during summation)

44.   *People v. Gourgue*, 239 A.D.2d 357 (2d Dep't 1997) (prosecutor put notes of complainant's statements in the form of questions to "circumvent" disclosure obligation)

45.   *People v. Hill*, 244 A.D.2d 572 (2d Dep't 1997) (prosecutor sanctioned for failing to disclose 911 tape)

46.   *People v. Gramby*, 251 A.D.3d 346 (2d Dep't 1998) (prosecutor suppressed 911 tape during pre-trial hearing and failed to disclose it before trial)

47.   *People v. Green*, 10/19/99 N.Y.L.J. p.30, col. 1 (Sup. Ct. Kings Cty.) (prosecution failed to disclose *Brady* material)

48.   *People v. Bond*, 95 N.Y.2d 840 (2000) (myriad *Brady* violations established at CPL § 440.10 hearing, including failure to disclose material witness proceeding concerning principal witness; conviction reversed due to failure of DA to disclose prior unrecorded statements to police by People's main witness that she did not see the shooting about which she testified as an "eyewitness")

49.   *People v. Davis*, 709 N.Y.S.2d 345 (Sup. Ct. Kings Cty. 2000) (KCDAO violated court's order to disclose exculpatory evidence to defense before indictment; indictment dismissed)

50.   *People v. Campbell*, 269 A.D.2d 460 (2d Dep't 2000) (prosecutor's suppression of *Rosario* material, a tape-recorded statement by the complainant, required reversal of conviction)

51.   *People v. Calabria*, 94 N.Y.2d 519 (2000) (prosecutor repeatedly defied court's ruling and made false or misleading argument to jury)

52. *People v. Campos*, 281 A.D.2d 638 (2d Dep't 2001) (prosecutor failed to timely disclose *Brady* material)

53. *Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001) (conviction overturned on habeas review due to ADA's suppression of *Brady* material; ADA additionally misled defense counsel regarding a crucial witness)

54. *People v. Maddery*, 282 A.D.2d 761 (2d Dep't 2001) (prosecutor's failure to disclose 911 tape before trial as required by law required reversal of conviction)

55. *Boyette v. LeFevre*, 246 F.3d 78 (2d Cir. 2001) (conviction vacated on habeas review because prosecutors suppressed numerous items of *Brady* material)

56. *People v. Cannon*, 191 Misc.2d 136 (Sup. Ct. Kings Cty. 2002) (police failed to preserve surveillance photographs, conduct for which the prosecution was "accountable")

57. *People v. King*, 298 A.D.2d 530 (2d Dep't 2002) (prosecutor's failure to disclose 911 tape before trial as required by law required conviction to be reversed)

58. *People v. Jenkins*, 98 N.Y.2d 280, 287-88 (2002) (Kaye, C.J., dissenting) (prosecutor's late disclosure of ballistics report "blind sided" the defense and was inexcusable)

59. *People v. Vielman*, 31 A.D.3d 674 (2d Dep't 2006) (reversing conviction because prosecutor's summation rested on a 'false premise" and was a "blatant attempt to mislead the jury")

60. *People v. Jones*, 31 A.D.3d 666 (2d Dep't 2006) (prosecution failed to correct the false testimony of a key witness)

61. *People v. Thompson*, 54 A.D.3d 975 (2d Dep't 2008) (prosecutor suppressed "*Brady* material" indicating that someone other than the defendant committed the crime)

62. *Watson v. Greene*, No. 06 CV 2212, 2009 WL 5172874 (E.D.N.Y. 2009) (Amon, J.) (prosecution disclosed *Brady* material "too late" for the defense to make use of it even though prosecution was aware of material "more than a year in advance of trial"), *reversed on other grounds*, 640 F.3d 501 (2d Cir. 2011)

63. *People v. Malik*, 25 Misc.3d 1214(A) (Sup. Ct. Kings Cty. 2009) (prosecution's suppression of police report and other documents required vacatur of conviction)

64. *People v. Fuentes*, 12 N.Y.3d 259 (2010) (prosecutor improperly withheld one page of notes from medical records of complainant containing potentially favorable evidence for the defense; two judges found the suppression was "deliberate")

65. *People v. Whitehurst*, 70 A.D.3d 1057 (2d Dep't 2010) (prosecutor's summation comment that the defendant did not deserve the jury's sympathy was improper)

66.    *People v. Umoja*, 70 A.D.3d 867 (2d Dep't 2010) ("some of the prosecutor's comments in summation were improper")

67.    People v. Leach, 90 A.D.3d 1072 (2d Dep't 2011) (some of prosecutor's summation remarks "were improper")

68.    *People v. Nelson*, 90 A.D.3d 954 (2d Dep't 2011) ("[P]rosecutor improperly went outside of the four corners of the evidence when, in summation, he made the inflammatory and unsupported remarks")

69.    *People v. World*, 89 A.D.3d 966 (2d Dep't 2011) ("some of the prosecutor's comments in summation were improper")

70.    *People v. Mohammed*, 81 A.D.3d 983 (2d Dep't 2011) (cumulative effect of the prosecutor's improper summation remarks deprived defendants of a fair trial)

71.    *People v. Mattocks*, 100 A.D.3d 930 (2d Dep't 2012) (prosecutor's improper impeachment of her own witness and improper use of the impeachment material during summation, along with other errors, required reversal)

72.    *People v. Lebovits*, 94 A.D.3d 1146 (2d Dep't 2012) (prosecutor's summation argument that witness was an accused child molester "had no basis within the record and was improper.")

73.    *People v. Rivera*, 91 A.D.3d 972 (2d Dep't 2012) (some of the prosecutor's summation remarks "were improper")

74.    *People v. Mehmood*, 112 A.D.3d 850 (2d Dep't 2013) (cumulative effect of prosecutor's improper comments in summation required new trial)

75.    *People v. King*, 110 A.D.3d 1005 (2d Dep't 2013) (Hines-Raddix, J., dissenting) ("[P]rosecutor's comments in summation were so inflammatory and prejudicial that they deprived the defendant of a fair trial.")

76.    *People v. Thompson*, 111 A.D.3d 56 (2d Dep't 2013) (prosecutor's remarks in summation compounded prejudice from improper admission of opinion testimony)

77.    *People v. Ward*, 106 A.D.3d 842 (2d Dep't 2013) (prosecutor made improper statements during summation)

78.    *People v. Ross*, 104 A.D.3d 878 (2d Dep't 2013) (prosecutor made improper statements during summation)