

**T**HE **C**ITY OF **N**EW **Y**ORK

# **L**AW **D**EPARTMENT

<table>
<tr><td>

**STEVEN BANKS**
*Corporation Counsel*
</td><td>

100 Church Street
NEW YORK, NY 10007
</td><td>

**HANNAH V. FADDIS**
*Assistant Deputy Chief of Trials*
Phone: (212) 356-2486
Fax: (212) 356-1148
hfaddis@law.nyc.gov
</td></tr>
</table>

March 20, 2026

**BY ECF**
Honorable Seth D. Eichenholtz
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:   Perkins v. City of New York, et al.,
>        24-CV-6366 (AMD) (SDE)
>
> Re:   Mayo v. City of New York, et al.,
>        24-CV-6403 (AMD) (SDE)

Your Honor:

Defendants the City of New York, Anthony Pitre, and Brian McNulty (collectively, "Defendants"), by their attorney, the New York City Law Department, respectfully submit this letter motion seeking (1) bifurcation of *Monell* discovery in these matters; and (2) an order accepting this filing *nunc pro tunc* to the February 27, 2026 deadline set by the Court.  Regarding the extension request, counsel for plaintiff Mayo consents, and counsel for plaintiff Perkins takes no position.

## 1. *Monell* Discovery Should Be Bifurcated

Defendants respectfully request that the Court bifurcate discovery in this action, staying *Monell* discovery until after the resolution of plaintiffs' claims against the individual defendants. Bifurcation will cost the plaintiffs nothing, will potentially save the Court and jury's time, and will avoid prejudice to the individual defendants. Pursuant to Rule 42(b) of the Federal Rules of Civil Procedure, a court may order separate proceedings "[f]or convenience, to avoid prejudice, or to expedite and economize." FED. R. CIV. P. 42(b). The Court has broad discretion to order bifurcation upon a showing of any one of these factors. *Amato v. City of Saratoga Springs*, 170 F.3d 311, 316 (2d Cir. 1999). Courts in this Circuit routinely bifurcate *Monell* discovery from individual liability discovery. *Id.*, 170 F.3d at 316; *see also Williams v. City of New York*, No. 07-CV-5362 (NG)(VVP), 2008 U.S. Dist. LEXIS 104730, at *3 (E.D.N.Y. Dec. 29, 2008) (noting that bifurcation is a "common practice" in this Circuit in civil rights cases and citing cases); *Busch v. City of New York*, No. 00-CV-5211 (SJ), 2002 U.S. Dist. LEXIS 18337, at *2 (E.D.N.Y. Sept. 9, 2002); *Morales v. Irizarry*, No. 5-CV-5068 (AGS)(HBP), 1996 U.S. Dist. LEXIS 15613, *1

(S.D.N.Y. Oct. 22, 1996) ("[t]he overwhelming weight of authority holds that…the most prudent course is to try the *Monell* claims separately and to stay discovery concerning those claims."); *Mineo v. City of N.Y.*, No. 09-CV-2261 (RRM)(MDG), 2013 U.S. Dist. LEXIS 46953, at *4 (E.D.N.Y. Mar. 29, 2013) (noting that bifurcation of civil rights trials is a "common practice in this Circuit"); *Oliver v. City of N.Y.*, 540 F. Supp. 3d 434, 437 (S.D.N.Y. 2021) (bifurcating *Monell* discovery pending resolution of liability on individual claims).

The majority of plaintiffs' discovery demands are directed at *Monell* liability rather than the underlying individual claims.[1] (Ex. A, Perkins First Discovery Demands). In *Perkins*, Interrogatories 2 through 6 are directed entirely at *Monell* issues—including those seeking information about the investigation and discipline of officers involved in unrelated lawsuits dating to the 1990s, NYPD policymaking authority, training materials from more than a quarter-century ago, and documents upon which the City intends to rely in opposing the *Monell* claim. (Ex. A). Of the specific document requests, Requests 10 through 12 and 14 through 26 are either entirely or predominantly *Monell*-directed, seeking training materials, disciplinary records, CCRB files, internal investigation records, court records, and KCDA conviction-integrity files from other cases. (*Id.*) Staying *Monell* discovery would thus dramatically narrow the scope of discovery and allow the parties to focus on the core individual liability issues. Indeed, responding to the *Monell* demands would consume the discovery process in this litigation.

Because a constitutional violation by an individual defendant is a prerequisite to Monell liability, *see City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986), resolution of the individual claims may eliminate the need for *Monell* discovery entirely. If Defendants prevail on the individual claims—whether at summary judgment or trial—the *Monell* claims necessarily fail, and the substantial burden of the *Monell* discovery described above will have been entirely avoided. *See Padilla v. City of N.Y.*, 1993 U.S. Dist. LEXIS 17 (S.D.N.Y. 1993); *see also* FED. R. CIV. P. 1 (noting that the Federal Rules of Civil Procedure "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding.") Conversely, if plaintiffs prevail in either case, a jury will determine compensatory, and perhaps punitive, damages, likely facilitating a resolution of the *Monell* claims without need for further litigation.

a. Plaintiffs' *Monell* Allegations Lack the Specificity Required to State a Viable Claim.

Even if the individual claims are resolved in plaintiffs' favor, the demanding standards governing *Monell* claims strongly suggest that the voluminous *Monell* discovery sought here will prove unnecessary. Plaintiffs allege *Monell* claims based on conduct by NYPD personnel sounding in failure to train, supervise, and discipline, and similar claims based on purported policies and practices of the Kings County District Attorney's Office ("KCDAO"). The Supreme Court has emphasized that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train," *Connick v. Thompson*, 563 U.S. 51, 61 (2011), and that a plaintiff must show a pattern of "similar constitutional violations" to establish deliberate

---

[1] Defendants have addressed the specifics of the *Perkins* claims and discovery demands, which encompass and are broader than those set forth in the *Mayo* matter. Because the two matters are proceeding jointly for discovery, defendants seek bifurcation in both.

indifference, *id.* at 62 (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)).  Courts in this Circuit have required that the prior misconduct underlying a *Monell* claim be both "contemporaneous to the misconduct at issue" and factually "similar." *Buari v. City of New York*, 530 F. Supp. 3d 356, 398–99 (S.D.N.Y. 2021); *accord Breton v. City of New York*, 404 F. Supp. 3d 799, 817–18 (S.D.N.Y. 2019). Moreover, a plaintiff advancing a failure-to-train theory of this sort must identify prior violations that "concern[] the nondisclosure of the same sort of evidence at issue in this case." *Greene v. City of New York*, 742 F. App'x 532, 536 (2d Cir. 2018) (summary order) (citing *Connick*, 563 U.S. at 62–63); *see also Jones v. City of New York*, 988 F. Supp. 2d 305, 313–14 (E.D.N.Y. 2013) (granting motion to dismiss where "impressive recitation of past Brady claims" did not include "the specific type of Brady material at issue").

Applying these standards to the present case demonstrates that plaintiffs' *Monell* claims are unlikely to withstand scrutiny; at a minimum, the tenuous nature of the pleading does favors deferring *Monell* discovery.  Plaintiff Mayo's Complaint at paragraph 298 lists fifty-one prior civil rights lawsuits, all of which plaintiff contends involved NYPD officers who "manufactured evidence, gave false testimony or statements, initiated prosecutions without probable cause, or otherwise violated the constitutional rights of the accused."  Plaintiff's discovery demands flow directly from this catalogue: Interrogatories 2 and 3 seek discipline and investigation records for every officer accused of misconduct in these cases, and Document Requests 11 and 25 seek the corresponding records.  Defendants note that the burden of investigating these matters, and identifying and obtaining the materials sought is driven by the volume, range, and age, of information sought.[2]  Taking plaintiffs' own descriptions of these matters at face value, the overwhelming majority of these cases are facially dissimilar to the claims at bar, and the catalogue as a whole is far too thin to support a viable *Monell* theory.

Plaintiffs' central claims in this action involve allegations that NYPD detectives withheld evidence and influenced witness identifications, leading to their wrongful convictions.  Based on plaintiffs' own descriptions, however, thirty-five of the fifty-one catalogued cases involve nothing more than garden-variety false arrest claims—arrests allegedly made without probable cause, typically for drug possession, weapons charges, disorderly conduct, or traffic violations, followed by dismissal or a declination to prosecute. *See, e.g.*, Complaint ¶ 298(b) (*Gallion*: arrest without probable cause; charges dismissed); ¶ 298(j) (*Boland*: arrest without probable cause; held two nights); ¶ 298(l) (*Kadlub*: arrest on drug charges without probable cause); ¶ 298(q) (*McCaskill*: arrest for disorderly conduct without probable cause); ¶ 298(cc) (*Perez*: arrest without probable cause; charges dismissed one month later). These cases do not involve fabricated evidence, coerced witnesses, suppressed exculpatory material, or wrongful convictions—the core misconduct alleged in Plaintiffs' Complaint. Under *Connick* and *Greene*, they cannot support a *Monell* theory premised on the "same sort" of violations at issue here. *Connick*, 563 U.S. at 62–63; *Greene*, 742 F. App'x at 536.

That leaves sixteen cases involving some allegation of false evidence, false testimony, or fabricated paperwork. But, the majority of even these cases are dissimilar to Plaintiffs' claims. Most involve officers who allegedly filed false paperwork—fabricated felony complaints, false

---

[2] Most of these fifty-one cases predate the widespread availability of electronic court records, and Defendants are accordingly unable readily to verify the nature of the claims beyond what is alleged in the Complaint.

summonses, or false criminal charges—rather than the detective-driven witness coercion and evidence fabrication alleged here. *See, e.g.*, Complaint ¶ 298(y) (*Gager*: false summonses for criminal trespass); ¶ 298(bb) (*Gordon*: false allegations in felony complaint); ¶ 298(ss) (*Lovell*: false statements in criminal complaint for turnstile jumping); ¶ 298(tt) (*Golston*: false charges of criminal harassment); ¶ 298(uu) (*Lindo*: false felony complaint). Filing a false criminal complaint is a different species of misconduct from influencing witness identifications or suppressing exculpatory evidence in a homicide investigation, and does not bear on whether the City had notice of deficiencies in training or supervision related to the latter.

Only approximately eight of the fifty-one cases involve allegations that bear any resemblance to the claims at bar—specifically, cases in which officers allegedly committed perjury before a grand jury, fabricated witness testimony, suppressed exculpatory evidence, or secured a wrongful conviction. *See* Complaint ¶ 298(h) (*Espinal*: false grand jury testimony; conviction vacated); ¶ 298(i) (*Victor*: perjury in grand jury; conviction vacated); ¶ 298(o) (*Rojas*: false grand jury testimony; conviction vacated); ¶ 298(r) (*Gurley*: wrongful conviction; exculpatory evidence withheld); ¶ 298(t) (*Howlen*: perjury; admitted perjury); ¶ 298(hh) (*Napoli*: false grand jury testimony; acquitted); ¶ 298(jj) (*Jefferson*: officers failed to disclose knowledge of plaintiff's innocence); ¶ 298(yy) (*Crespo*: *Monell* claim alleging policy of perjury and falsification). But even these cases are distinguishable. None, on the face of the Complaint, involves the specific pattern alleged here: detectives coercing civilian witnesses into providing fabricated testimony and manufacturing identification evidence in a homicide investigation. The misconduct alleged in these eight cases—perjury by officers themselves, suppression of a ballistics report, failure to disclose a cooperating witness's innocence—is simply not the "same sort of evidence" as the claims at bar. *Greene*, 742 F. App'x at 536.

    b.   <u>Plaintiffs Have Not Connected Any Identifiable Policy or Practice to the Facts of This Case.</u>

Separate from the lack of factual similarity, Plaintiffs' Complaint fails to identify any specific policy, custom, or practice that can plausibly be connected to the misconduct alleged in this case. Plaintiffs' Monell allegations span decades of generalized NYPD misconduct involving a rotating cast of detectives across different precincts and different types of investigations. The Complaint devotes pages to the misconduct of Detectives Louis Scarcella and Stephen Chmil in a series of Brooklyn homicide investigations from the late 1980s through the early 1990s. (Compl. ¶¶ 192–220.) It then shifts to the unrelated misconduct of Detective Michael Race, who fed details to informants and coerced false testimony in narcotics-related cases. (*Id.* ¶¶ 221–232.) It further catalogs cases involving manufactured lineup identifications by still other detectives (*Id.* ¶¶ 254–296) and invokes the 1994 Mollen Commission Report (*id.* ¶¶ 183–189) and the KCDAO's history of alleged prosecutorial misconduct. (*Id.* ¶¶ 233–252.) What is conspicuously absent from this narrative, however, is any effort to connect these varied episodes of misconduct to a coherent policy or practice that allegedly caused what happened to Donnell Perkins and Kareem Mayo.

A *Monell* claim requires more than a showing that a municipality employed officers who committed misconduct; it requires the plaintiff to "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). Plaintiffs' approach—cataloging decades of generalized NYPD and KCDAO misconduct without tying any specific policy to the facts of this case—is precisely the kind of untethered *Monell* theory that courts in this Circuit have repeatedly rejected. *See Simms*,

480 Fed. App'x at 630; *Buari*, 530 F. Supp. 3d at 398–99. That the NYPD and KCDAO may have had institutional shortcomings in the 1990s and 2000s does not, without more, establish that a specific policy or custom was the "moving force" behind the particular constitutional violations alleged here.

      c.   <u>The Catalogued Cases, All Resolved by Settlement, Cannot Establish the Required Pattern.</u>

All of the fifty-one cases cited by Plaintiff—including the eight closest analogues—were resolved by settlement, not by any judicial finding of a constitutional violation. The existence of settled lawsuits, without more, cannot establish the pattern of "actual similar constitutional violations" required to support a *Monell* claim. *Monahan v. City of N.Y.*, No. 20-Civ-2610 (PKC), 2022 U.S. Dist. LEXIS 59124, at *51–53 (S.D.N.Y. Mar. 30, 2022) ("The fact that a civil action was filed and settled voluntarily is not evidence of liability on the part of the City, let alone evidence that the City was on notice of a claimed deficiency in the training it gave to NYPD members."); *Simms v. City of N.Y.*, 480 Fed. App'x 627, 630 (2d Cir. 2012) (summary order) (prior lawsuits establish only "that other individuals have plausibly alleged that they experienced similar violations," not that violations actually occurred); *Jean-Laurent v. Wilkerson*, 461 Fed. App'x 18, 23 (2d Cir. 2012) (citation to past lawsuits "not probative of the existence of an underlying policy"). Courts in other districts have reached the same conclusion. *See Harris v. City of Chicago*, 2025 WL 2044020, at *5 (N.D. Ill. July 21, 2025) ("A finding of liability either by judge or jury confirms the existence of unconstitutional practices in a way settlements and allegations do not. If settlements were afforded the same status as verdicts, that could dissuade litigants from engaging in settlement to resolve cases.")

A recent decision from this District confirms this analysis. In *Capers v. City of New York*, No. 24-CV-1219 (RPK)(CLP) (E.D.N.Y. Mar. 11, 2026) (ECF No. 60), Judge Kovner conducted precisely this kind of whittling-down exercise in dismissing a *Monell* claim in a wrongful conviction case. There, as here, the plaintiff relied on an extensive list of prior misconduct—over 100 criminal appeals and a prosecutorial survey. The court applied temporal and similarity filters, finding that the bulk of the cited cases were remote in time and that only a small number involved the specific type of misconduct at issue. "Even drawing reasonable inferences in [plaintiff's] favor, such a relatively small number of cases . . . in such a large municipality does not plausibly suggest that the alleged practice is 'so widespread as to have the force of law.'" *Buari*, 530 F. Supp. 3d at 406 (quoted in *Capers*, ECF No. 60 at 14); *see also Jones v. Town of E. Haven*, 691 F.3d 72, 85 (2d Cir. 2012) (concluding that "two instances, or at the most three, over a period of several years . . . fell far short of showing a policy, custom, or usage"). The same result obtains here: once the fifty-one catalogued cases are filtered for similarity, what remains is at most a handful of only loosely analogous settled cases.

Given the foregoing, the probability that the *Monell* discovery demanded in this case—the majority of which seeks discipline, investigation, and training records tied to these fifty-one catalogued lawsuits—will yield admissible evidence relevant to a viable *Monell* theory is low. Deferring that discovery until the individual liability claims are resolved would conserve the resources of the parties and the Court while preserving Plaintiffs' right to pursue *Monell* discovery should the need arise.

5

### 2.   Defendants Respectfully Request This Filing Be Accepted *Nunc Pro Tunc*

At the January 28, 2026 status conference, this Court set a deadline of February 27, 2026 for defendants to file a motion seeking leave to bifurcate *Monell* discovery. Defendants were unable to meet that deadline due to extenuating personal circumstances. Specifically, on February 2, 2026, undersigned lead counsel experienced a flood in her home that required extensive emergency repairs. Counsel was working only intermittently for most of February while managing the repairs, including a secondary water outage caused by the repair work. Counsel lost almost another week in February to illness. These circumstances prevented defendants from timely preparing and filing this bifurcation application. Defendants communicated with plaintiffs' counsels and requested consent to an extension of time to file this application by March 20.

Defendants have now had the opportunity to review Plaintiff's discovery demands in *Perkins* and note that the substantial majority of the document requests and interrogatories are directed at *Monell* discovery rather than the underlying individual liability claims. Defendants received Plaintiff's document requests and interrogatories in *Mayo* on  March 4, 2026.[3] Given the volume of *Monell*-directed discovery in *Perkins*, Defendants believe there is good cause to seek bifurcation.

Defendants respectfully submit that excusable neglect supports acceptance of this filing *nunc pro tunc*. The four-factor test set forth in *Pioneer Investment Services Co. v. Brunswick Associates Ltd.* Partnership, 507 U.S. 380, 395 (1993), weighs in Defendants' favor. First, the delay is short—approximately three weeks past the original deadline. Second, there is no danger of prejudice to plaintiffs; the fact discovery deadline is not until June 29, 2026, and no discovery has been stayed or delayed pending this application;[4] furthermore, the great preponderance of non-*Monell* discovery requested by plaintiffs is already within their possession from prior proceedings. Third, the reason for the delay—a household emergency compounded by illness—was beyond counsel's control and constitutes good cause. Fourth, Defendants acted in good faith and filed this application promptly once circumstances permitted. *See also Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 366–68 (2d Cir. 2003) (applying *Pioneer* factors to evaluate excusable neglect).

Moreover, plaintiffs' counsel were aware of Defendants' intent to seek bifurcation from the January 28, 2026 status conference, and the delay in filing has not disrupted the litigation schedule.

---

[3] Defendants met and conferred with plaintiffs' counsel on March 17, 2026. The parties were unable to resolve the dispute, and defendants' position remains as set forth herein.

[4] The parties have met and conferred and defendants are preparing their written objections and responses to plaintiffs' discovery demands in order to keep discovery moving pending resolution of this issue; defendants anticipate objections to most of plaintiffs' *Monell* discovery demands for *inter alia* the reasons set forth herein.

The defendants thank the Court for its consideration of these requests.

Respectfully Submitted,

/s/

Hannah V. Faddis
John McLaughlin
Attorneys for Defendants
*Special Federal Litigation Division*
New York City Law Department
100 Church Street
New York, NY 10007
(212) 356-2486/2670
hfaddis@law.nyc.gov
jmclaugh@law.nyc.gov

CC:   **VIA ECF**
      *All counsel of Record*

7